# No. 26-_______

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

DORETHEA FRANKLIN, TANIQUA SIMMONS, DE'JON HALL, JANE DOE, individually and on behalf of a class of others similarly situated, SHIRLEY SARMIENTO, EBONY YELDON, CHARLES PALMER, SHAKETA REDDEN, and JOSEPH BONDS,
*Plaintiffs-Petitioners*,

v.

CITY OF BUFFALO, N.Y., BYRON B. BROWN, Mayor of the City of Buffalo, in his individual and official capacities, BYRON C. LOCKWOOD, Commissioner of the Buffalo Police Department, in his individual capacity, DANIEL DERENDA, former Commissioner of the Buffalo Police Department, in his individual capacity,
*Defendants-Respondents*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK

**PLAINTIFFS' PETITION FOR LEAVE TO APPEAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)**

Philip A. Irwin
Jordan S. Joachim
Christine A. Nelson
Jacob T. Stark
COVINGTON & BURLING LLP
30 Hudson Yards
New York, New York 10001
(212) 841-1000

Claudia Wilner
NATIONAL CENTER FOR LAW AND ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, New York 10004
(212) 633-6967

*(Counsel Continued on Inside Cover)*

*Attorneys for Plaintiffs-Petitioners*

Matthew Alan Parham
WESTERN NEW YORK LAW CENTER
Cathedral Park Tower
37 Franklin Street, Suite 210
Buffalo, New York 14202
(716) 828-8415

Baher Azmy
A. Chinyere Ezie
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

*Attorneys for Plaintiffs-Petitioners*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 3

QUESTIONS PRESENTED .......... 3

RELIEF SOUGHT .......... 3

STATEMENT OF THE CASE .......... 4

A. Factual Background .......... 4

B. Procedural History .......... 5

REASONS FOR GRANTING THE PETITION .......... 9

I. The District Court's Order Is Questionable and Effectively Terminates the Litigation. .......... 9

A. The District Court's Reasons for Denying the Motion to Renew Are Questionable .......... 10

1. The District Court Applied the Wrong Standard to Plaintiffs' Rule 23(c)(1)(C) Motion to Renew. .......... 10

2. The District Court's Standing Analysis Is Questionable. .......... 12

3. The District Court Used the Wrong Criteria to Determine Ascertainability. .......... 18

4. The District Court's Denial of Class Certification on Grounds that the Class Seeks an "Obey the Law" Injunction Violates Rule 23. .......... 20

B. The District Court's Denial of Class Certification Is a Death Knell for the Class. .......... 24

II. The District Court's Order Implicates Legal Questions About Which There Is a Compelling Need for Resolution and Special Circumstances Warranting Review....................................25

CONCLUSION ..........................................................................................26

CERTIFICATE OF COMPLIANCE .........................................................28

CERTIFICATE OF SERVICE...................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adkins v. Morgan Stanley*,
307 F.R.D. 119 (S.D.N.Y. 2015) ........ 25

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ........ 26

*Amnesty Am. v. Town of W. Hartford*,
361 F.3d 113 (2d Cir. 2004) ........ 15

*Barrows v. Becerra*,
24 F.4th 116 (2d Cir. 2022) ........ 20, 21

*City of Canton v. Harris*,
489 U.S. 378 (1989) ........ 15

*City of New York v. Mickalis Pawn Shop, LLC*,
645 F.3d 114 (2d Cir. 2011) ........ 22, 23

*Cody v. City of St. Louis ex rel. Medium Sec. Inst.*,
103 F.4th 523 (8th Cir. 2024) ........ 8, 11

*Comer v. Cisneros*,
37 F.3d 775 (2d Cir. 1994) ........ 12

*Doe v. McDonald*,
128 F.4th 379 (2d Cir. 2025) ........ 12, 13

*Elisa W. v. City of New York*,
82 F.4th 115 (2d Cir. 2023) ........ 17, 20, 21

*Fed. Defs. of N.Y. v. Fed. Bureau of Prisons*,
954 F.3d 118 (2d Cir. 2020) ........ 13

*Hargrove v. Sleepy's LLC*,
974 F.3d 467 (3d Cir. 2020) ........ 8, 10, 11, 25

*Hevesi v. Citigroup Inc.*,
366 F.3d 70 (2d Cir. 2004) .................................................................. 9

*Hodgers-Durgin v. de la Vina*
199 F.3d 1037 (9th Cir. 1999)............................................................ 15

*Hyland v. Navient Corp.*,
48 F.4th 110 (2d Cir. 2022)........................................................... 14, 21

*In re Initial Pub. Offering Sec. Litig.*,
483 F.3d 70 (2d Cir. 2007) ................................................................ 10

*Jobie O. v. Spitzer*,
2007 WL 4302921 (S.D.N.Y. Dec. 5, 2007)......................................... 13

*Knox v. Salinas*,
193 F.3d 123 (2d Cir. 1999) .............................................................. 19

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)........................................................................... 12

*Madanat v. First Data Corp.*,
626 F. App'x 349 (2d Cir. 2015)......................................................... 14

*Mhany Mgmt., Inc. v. County of Nassau*,
819 F.3d 581 (2d Cir. 2016) ......................................................... 13, 14

*Microsoft Corp. v. Baker*,
582 U.S. 23 (2017).............................................................................. 24

*Murthy v. Missouri*,
603 U.S. 43 (2024).............................................................................. 15

*Nicacio v. INS*,
797 F.2d 700 (9th Cir. 1985).............................................................. 15

*Patsy's Italian Rest., Inc. v. Banas*,
658 F.3d 254 (2d. Cir. 2011) .............................................................. 24

*Peregrine Myanmar Ltd. v. Segal*,
89 F.3d 41 (2d Cir. 1996) ................................................................... 24

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017) .................................................. 18, 19, 20

*Phillips v. Sheriff of Cook Cnty.*,
828 F.3d 541 (7th Cir. 2016)................................................................ 9

*Plaintiffs #1-21 v. County of Suffolk*,
2021 WL 1255011 (E.D.N.Y. Mar. 12, 2021) ..................................... 19

*Prado-Steiman ex rel. Prado v. Bush*,
221 F.3d 1266 (11th Cir. 2000).......................................................... 24

*Shain v. Ellison*,
356 F.3d 211 (2d Cir. 2004) ................................................................ 14

*Shrader v. CSX Transp., Inc.*,
70 F.3d 255 (2d Cir. 1995) .................................................................. 11

*Stockwell v. City & County of San Francisco*,
749 F.3d 1107 (9th Cir. 2014)................................................................ 9

*In re Sumitomo Copper Litig.*,
262 F.3d 134 (2d Cir. 2001) ........................................................ 24, 26

*Sykes v. Mel S. Harris & Assocs.*,
780 F.3d 70 (2d Cir. 2015) .......................................................... 20, 23

*United States v. Florida*,
2026 WL 879178 (11th Cir. Mar. 31, 2026) ....................................... 14

*Van Buskirk v. United Grp. of Cos.*,
935 F.3d 49 (2d Cir. 2019) .................................................................. 11

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)..................................................................... 21, 26

*White v. Mathews*,
559 F.2d 852 (2d Cir. 1977) ................................................................ 13

*In re White*,
64 F.4th 302 (D.C. Cir. 2023) ........................................................ 9, 13

## Constitutional Provisions

U.S. Const., amend. XIV .......................................................................... 6

## Statutes

28 U.S.C. § 1292(e) ................................................................................ 3

28 U.S.C. § 1331...................................................................................... 3

42 U.S.C. § 20000(d) .............................................................................. 6

## Other Authorities

Federal Rule of Appellate Procedure 5(c)............................................... 28

Federal Rule of Appellate Procedure 23(a) ............................................ 11

Federal Rule of Appellate Procedure 23(b) .................................... *passim*

Federal Rule of Appellate Procedure 23(c)..................................... *passim*

Federal Rule of Appellate Procedure 23(f) ....................................... 2, 8, 9

Federal Rule of Civil Procedure 65(d) ........................................ 22, 23, 26

## INTRODUCTION

This petition arises out of a deeply flawed order denying certification of a Rule 23(b)(2) Class seeking injunctive relief to halt ongoing racially discriminatory traffic enforcement by the Buffalo Police Department. The district court's decision rests on a series of legal errors of critical importance to class actions and civil rights cases more broadly, and it effectively terminates the Class's ability to obtain relief. The order therefore merits immediate review by this Court.

First, the district court wrongly analyzed Plaintiffs' motion to renew class certification under Rule 23(c)(1)(C) by importing the heightened standard for motions for reconsideration. That analysis conflicts with the text of Rule 23(c)(1)(C) and authority recognizing that class certification orders may be altered without any requirement of "newly available" evidence. By demanding more than Rule 23 requires, the court foreclosed certification on an erroneous procedural ground.

Second, the district court's standing analysis misapplied controlling authority. The court failed to assess whether Plaintiffs had standing for injunctive relief as of the time they filed (or joined) the action, as Second Circuit and Supreme Court precedent require, and discounted extensive

record evidence of the non-speculative risk of future discriminatory traffic enforcement.

Third, the district court's conclusions that the Class is unascertainable and seeks an "obey the law" injunction are incompatible with controlling precedent. Ascertainability requires only an objective class definition, which the Class has, and contemplates classes encompassing future members as a matter of settled law. The district court misconstrued both the relief Plaintiffs seek—which is not a generalized command to obey the law, but tailored reforms to Buffalo's policies and practices—and Plaintiffs' burden at class certification, which is to show that a single order would provide relief to the entire class.

Taken together, these errors foreclose Plaintiffs and Class Members from obtaining relief absent immediate appellate intervention. This Court previously granted a Rule 23(f) petition filed by Defendants to review the district court's original class certification order, which certified two damages classes. *See* No. 25-1191. The Court should follow the same path here and grant Plaintiffs' petition to appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1292(e).

## QUESTIONS PRESENTED

A. Did the district court improperly apply the heightened standard for motions for reconsideration when reviewing Plaintiffs' motion to renew class certification?

B. Did the district court err in denying class certification based on its questionable determination that Plaintiffs did not have standing to seek injunctive relief?

C. Did the district court err in denying class certification because it failed to recognize that an ascertainable class definition may encompass future members and need not specify the duration of the proposed injunction?

D. Did the district court err in denying class certification based on its conclusion that Plaintiffs seek an "obey the law" injunction when Plaintiffs seek specific injunctive remedies commonplace in civil rights cases and Rule 23(b)(2) classes?

## RELIEF SOUGHT

This Court should grant permission to appeal the district court's order denying Plaintiffs' motion to renew class certification under Federal Rule of Civil Procedure 23(c)(1)(C).

## STATEMENT OF THE CASE

### A. Factual Background

Plaintiffs challenge the well-documented and ongoing use of racially discriminatory traffic enforcement practices by the City of Buffalo's police department ("BPD"). These practices include crime suppression checkpoints targeted at Black and Latino neighborhoods; multiple tinted-windows ticketing of Black and Latino drivers; and rampant racial profiling during traffic enforcement, which continues to this day. *See, e.g.*, Dkts. 203-1 ¶ 34; 210 ¶ 57; 210-14; 287 (sealed) ¶¶ 14, 17-19, 32-35.[1]

Since at least 2012, BPD has systematically conducted traffic stops and issued tickets to motorists based on the color of their skin. BPD conducts thousands of pretextual stops each year, overwhelmingly targeting Black and Latino motorists. Dkt. 287 (sealed) ¶¶ 14, 17-19, 32-35. Strong, statistically significant evidence shows that from 2012-2022, BPD ticketed Black and Latino drivers at 3.2 times the rate of other drivers, despite there being no data to suggest that Black drivers commit more traffic violations than white drivers. *See* Dkts. 203-1 ¶¶ 14-15; 203-

[1] Unless otherwise specified, "Dkt." refers to the district court docket. *See Franklin v. City of Buffalo, N.Y.*, No. 1:18-cv-719 (W.D.N.Y.).

13 (207:11-15). These disparities have persisted through at least March 2025. *See* Dkt. 317-10 ¶¶ 1, 6.

BPD's practices have drawn criticism from across the community, including scores of complaints to its Internal Affairs Division and multiple reports documenting widespread perceptions of discriminatory policing, and the Mayor has publicly acknowledged racism on the police force. *See Hall v. City of Buffalo, N.Y.*, No. 25-2216 (2d Cir.), Joint Appendix ("JA") (A-870-75; A-1000-15); Dkt. 209 at 19, 34. BPD is incapable of identifying and addressing racial discrimination by officers because its policymakers have chosen to rely exclusively on an ineffective and substandard internal affairs function for this task. *See* JA (A-953-54). BPD has failed to take preventative steps commonly employed in other jurisdictions to prevent discrimination, to train its officers on its own traffic enforcement policy, to supervise and discipline offending officers, and to bring its internal complaint systems up to industry standards. *See id.* (A-878-962; A-1000-15).

### B. Procedural History

Plaintiffs filed this class action on June 28, 2018, Dkt. 1, and an amended complaint on May 21, 2020, Dkt. 63, focused on redressing

harms caused by BPD's policies, customs, and practices. Plaintiffs sought to certify two damages classes and a third "Traffic Enforcement Class" that seeks injunctive relief pursuant to Federal Rule of Civil Procedure 23(b)(2) for "[a]ll Black and/or Latino individuals who have been or will be subjected to traffic stops, traffic tickets, and 'traffic safety' vehicle checkpoints by the BPD." Dkt. 211 at 3. Only the Traffic Enforcement Class (the "Class") is at issue here.

On behalf of the Class, Plaintiffs allege violations of the Equal Protection and Due Process provisions of the Fourteenth Amendment to the U.S. Constitution as well as Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 20000(d). Dkt. 63 ¶¶ 440-54. The Class seeks specific policy reforms to end the discriminatory traffic enforcement harming Black and Latino motorists. *See* Dkts. 63 at 73-74; 211 at 48-49.

On April 22, 2025, the district court denied certification for the Class. *See* Addendum ("Add.") 36. The court faulted the Class for failing to "specify a time period for … membership or … a future duration for the proposed injunction," and "[t]o the extent" that it sought impermissible "obey the law" relief. *Id.* 32. The court then concluded that Plaintiffs lacked standing to pursue injunctive relief. *Id.* 36. The court

explained that such relief required assessing "the likelihood of future constitutional violations," but, as of the date of the class certification motion, Plaintiffs' allegations of injury referred to instances of only "past harm." *Id.* 32, 36.

The district court granted certification of the two damages classes. Add. 36-51. Defendants successfully petitioned this Court for permission to appeal that aspect of the decision, and briefing of that appeal is underway. *See* Nos. 25-1191, 25-2216 (2d Cir.).

Plaintiffs moved the district court to reconsider its denial of class certification, and, in the alternative, renewed their motion pursuant to Federal Rule of Civil Procedure 23(c)(1)(C). Dkt. 327. Plaintiffs also moved to intervene two new plaintiffs, each of whom had experienced multiple instances of recent, discriminatory traffic enforcement. Dkt. 326. Plaintiffs based their motion to renew on all the arguments and evidence in the original class certification record; newly developed evidence of BPD's discriminatory traffic enforcement; supplemental declarations from two existing Plaintiffs who had each experienced discriminatory traffic enforcement in 2025; and the proposed intervention of the two new plaintiffs. Dkt. 327.

The district court denied all three motions in a single order ("the Order"). *See* Add. 1-23. In denying reconsideration, the court reaffirmed its earlier determination that Plaintiffs lacked standing because their risk of future harm was speculative. Add. 6. The court also explicitly stated for the first time that the Class could not be certified because it was unascertainable and because Plaintiffs sought an "obey the law" injunction. *Id.* at 7-8. In denying the motion to renew, the court held that the standard for renewal "mirrors the standard required for reconsideration," and in reconsideration cases, "evidence within a party's possession prior to the court's ruling is rarely deemed 'newly available evidence.'" *Id.* at 21 (citation omitted). Because "all of [Plaintiffs' proffered] evidence was available prior to the court's April 22, 2025 ruling on class certification," the court denied renewal "[f]or the same reasons that reconsideration was denied." *Id.* at 22.

Plaintiffs now petition this Court for permission to appeal the Order.[2]

[2] This Court has not addressed whether petitions to appeal are properly taken from motions to renew. They are. Rule 23(f) permits an appeal from "an order granting or denying class-action certification," and rulings on motions to renew are such orders. Other courts have therefore granted petitions to appeal from motions to renew. *E.g.*, *Cody v. City of St. Louis ex rel. Medium Sec. Inst.*, 103 F.4th 523, 527-28 (8th Cir. 2024); *Hargrove*
(continued…)

## REASONS FOR GRANTING THE PETITION

"[C]ourts of appeals enjoy 'unfettered discretion' to grant or deny permission to appeal based on 'any consideration that the court of appeals finds persuasive.'" *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 76 (2d Cir. 2004) (citation omitted). Petitioners seeking leave to appeal pursuant to Rule 23(f) must "demonstrate *either* (1) that the certification order will effectively terminate the litigation and there has been a substantial showing that the district court's decision is questionable, *or* (2) that the certification order implicates a legal question about which there is a compelling need for immediate resolution." *Id.* Plaintiffs here satisfy both factors.

### I. The District Court's Order Is Questionable and Effectively Terminates the Litigation.

Rule 23(f) review is proper because the Order is not merely questionable, but erroneous four times over. These errors finish the Class

---

*v. Sleepy's LLC*, 974 F.3d 467, 475 (3d Cir. 2020); *In re White*, 64 F.4th 302, 307 (D.C. Cir. 2023); *Stockwell v. City & County of San Francisco*, 749 F.3d 1107, 1110-11 (9th Cir. 2014).

Although some courts accept appeals from motions to renew "only when" the new order "materially alter[s] a previous order granting or denying class certification," *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 559 (7th Cir. 2016) (citation omitted), the decision below meets that standard. The renewal decision—which incorporated the reconsideration ruling—substantially elaborated upon the court's original ascertainability and "obey the law" findings. *Compare* Add. 7-8 *with* Add. 32.

and the injunctive relief it seeks for years of discriminatory BPD policies and practices that are ongoing. This Court should act now to correct the decision below and clarify the law.

### A. The District Court's Reasons for Denying the Motion to Renew Are Questionable.

#### 1. The District Court Applied the Wrong Standard to Plaintiffs' Rule 23(c)(1)(C) Motion to Renew.

The district court's conflation of the standards for motions for renewal and reconsideration warrants reversal. By requiring Plaintiffs to show "newly available evidence" not "within a party's possession prior to the court's ruling," Add. 21, the court erroneously "import[ed] the stringent motion-for-reconsideration standard to a renewed motion for class certification," *Sleepy's*, 974 F.3d at 477. Doing so imposed a burden on Plaintiffs found nowhere in the text of Rule 23(c)(1)(C).

District courts have "ample discretion" under Rule 23(c)(1)(C) "to consider … a revised class certification motion after an initial denial." *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 (2d Cir. 2007). That Rule permits a court to "alter[] or amend[]" an "order that grants or denies class certification" any time "before final judgment." Fed. R. Civ. P. 23(c)(1)(C). This language contemplates "multiple bites at the apple throughout the litigation," *Sleepy's*, 974 F.3d at 476. In keeping with Rule

23(c)(1)(C)'s permissive language, a court may certify a class on a motion to renew "even if there has been no change in the law and no new evidence produced." *Id.* at 477*; accord Cody*, 103 F.4th at 529 (affirming grant of renewal motion "on an unchanged record").

By contrast, a "motion for reconsideration is an extraordinary request." *Van Buskirk v. United Grp. of Cos.*, 935 F.3d 49, 54 (2d Cir. 2019). The standard governing reconsideration is commensurately "strict," and such motions are "generally … denied" *unless* movants can point to "controlling decisions or data that the court overlooked." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

Here, the district court improperly conflated renewal with reconsideration and used the latter's heightened standard to reject Plaintiffs' motion. The court asserted that the standard for renewal "mirrors the standard required for reconsideration." Add. 21. The court then denied Plaintiffs' motion to renew because the evidence used to support the motion "was available prior to the court's April 22, 2025 ruling on class certification," without actually assessing whether Plaintiffs' renewed motion satisfied Rule 23(a) and (b)(2). This error

denies Plaintiffs their opportunity to address the district court's reservations *before* final judgment, contravening Rule 23(c)(1)(C).

#### 2. The District Court's Standing Analysis Is Questionable.

The Order's standing analysis likewise rests on erroneous legal determinations. The district court confused standing with mootness, imposing an improper burden on Plaintiffs. It compounded this error by failing properly to assess the risk of future harm Plaintiffs faced at the time they joined the action. *See* Add. 4-7.

##### a) The District Court Improperly Conflated Standing with Mootness and Failed to Assess Standing as of the Date Plaintiffs Joined the Action.

It is well-settled that "'standing is to be determined as of the commencement of suit,' even for plaintiffs seeking forward-looking relief." *Doe v. McDonald*, 128 F.4th 379, 384 (2d Cir. 2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5 (1992)). And when plaintiffs join an action after a complaint is filed, their standing is evaluated as of the date they sought leave to enter the action. *See Comer v. Cisneros*, 37 F.3d 775, 791, 801 (2d Cir. 1994). Class actions are no exception to this ordinary rule. *See id.* at 796 (analyzing standing as of "the commencement of th[e] suit" in a class action).

Post-filing events "do not pertain to standing" and instead concern "whether they render [a] case moot." *Doe*, 128 F.4th at 384. That inquiry determines whether plaintiffs *continue* to have a sufficient stake in the litigation as it progresses. *See Fed. Defs. of N.Y. v. Fed. Bureau of Prisons*, 954 F.3d 118, 126 (2d Cir. 2020). While a plaintiff must show that they have standing, it is a defendant's burden to establish mootness. *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016). Defendants here have never argued that this case is moot, nor could they, as the practices Plaintiffs challenge are ongoing. *See supra* at 4-5.

The district court relied on *White v. Mathews*, 559 F.2d 852, 857 (2d Cir. 1977), for the proposition that the Second Circuit evaluates "standing for the class as of the date when the named plaintiff moved to certify the class." Add. 6 (cleaned up). This is incorrect because *White* concerned the doctrine of mootness—not standing.[3]

The district court's flawed analysis led to two significant errors. First, the court *never* assessed whether Plaintiffs had injunctive standing as of the date they joined the lawsuit. This alone is reversible error.

[3] The district court also relied on *Jobie O. v. Spitzer*, 2007 WL 4302921 (S.D.N.Y. Dec. 5, 2007), an unpublished opinion that, like the Order, is imprecise in its discussion of standing and mootness. *See* Add. 6.

*Madanat v. First Data Corp.*, 626 F. App'x 349, 350 (2d Cir. 2015) (summary order) (district court erred by determining standing based on post-filing events). Second, by requiring Plaintiffs to establish continuous standing from filing to class certification, the district court essentially compelled Plaintiffs to demonstrate the absence of mootness. This runs counter to the principle that mootness is Defendants' burden. *See Mhany Mgmt.*, 819 F.3d at 603.

**b) The District Court Erred in Concluding that the Risk of Future Harm Was Speculative.**

The district court also incorrectly determined that Plaintiffs lacked standing because they alleged only "infrequent and past harm," and "their risk of future harm depends upon a speculative chain of inferences." Add. 6. Record evidence compels the conclusion that "at least one plaintiff [has] standing in [this] class action," *Hyland v. Navient Corp.*, 48 F.4th 110, 117-18 (2d Cir. 2022).

The key element for injunctive standing is a "likelihood of future harm" arising from "an official policy or its equivalent." *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004). "It need not be literally certain that the injury will come about so long as there is a substantial risk." *United States v. Florida*, 2026 WL 879178, at *14 (11th Cir. Mar. 31, 2026). Past

harms that are "likely traceable" to a governmental policy "can serve as evidence of expected future harm" so long as the policy persists. *Murthy v. Missouri*, 603 U.S. 43, 70 (2024). And deliberate indifference is a "deliberate choice … properly thought of as" an official policy. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Thus, the question is whether Plaintiffs, who are Black motorists, faced a "substantial risk" of being stopped or ticketed by BPD based on race when they joined the lawsuit in 2018 and 2020. *Murthy*, 603 U.S. at 58. The answer is yes. "The possibility of recurring injury ceases to be speculative when actual repeated incidents are documented." *Nicacio v. INS*, 797 F.2d 700, 702 (9th Cir. 1985), *overruled in part on other grounds*, *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1044-45 (9th Cir. 1999).

Here, multiple Plaintiffs attested that they experienced racially discriminatory traffic stops and tickets in 2015, 2016, 2017, and 2018. *See* Dkts. 202-1 ¶¶ 5-8; 202-2 ¶ 6; 202-5 ¶¶ 7-9; 202-6 ¶¶ 7-10; 202-9 ¶ 6. Plaintiffs' police practices expert documented dozens more complaints alleging racially discriminatory traffic enforcement in the same time

frame. *See* JA (A-1000-15). And Buffalo's own data establishes that the harms Plaintiffs experienced occurred citywide: Black and Latino motorists were ticketed at a statistically significant 3.2 times the rate of other motorists despite "no data to suggest" that they committed more traffic infractions. Dkts. 203-1 ¶¶ 15, 269-73 & Table 11; 203-13 (207:11-15). This record provides ample evidence of racially discriminatory traffic enforcement, continually occurring from 2012 to the present, that injured Plaintiffs and Class Members.

The district court improperly dismissed these incidents as "past harm," ignoring the substantial evidence in the record tying these incidents to an ongoing City policy of deliberate indifference to racial discrimination that threatens future harm to Plaintiffs and Class Members alike. Despite ample notice that BPD continuously engaged in discriminatory traffic enforcement from at least 2012 to 2024, *see* JA (A-861; A-1000-15); Dkt. 209 at 19, 34, Buffalo's official policy was one of inaction. High-ranking City officials knew about numerous complaints of racially discriminatory treatment by BPD officers, but they failed to institute policies and procedures to monitor, supervise, investigate,

discipline, or train officers in accordance with acceptable police-practices standards. *See* JA (A-850-978; A-1000-15).

The district court improperly overlooked this evidence, missing the forest for the trees by focusing on factual variations of individual stops while ignoring their common moving force: the policy of inaction that all but guarantees that racist traffic enforcement will continue. *See Elisa W. v. City of New York*, 82 F.4th 115, 126 (2d Cir. 2023) (district court erred by focusing on the differing circumstances of individual children rather than the common municipal failures that placed each child at "unreasonable risk of harm").

No "speculative chain of inferences" (Add. 6) is required to reveal the substantial risk Plaintiffs face by driving in Buffalo—an unavoidable necessity of daily life. Indeed, Plaintiffs Hall and Bonds endured unjustified racial profiling and gratuitous multiple ticketing as recently as 2025. Dkts. 294 ¶¶ 24-25; 299 ¶¶ 4, 33-35. These incidents show that the risk these Plaintiffs faced in 2018 and 2020 was not just "substantial" but certain.

The additional evidence provided in support of the motion to renew only underscores that the risk Plaintiffs faced in 2018 and 2020 was real

and impending. This included newly developed video evidence documenting racially-motivated pretextual stops in 2024 (similar to Plaintiff Hall's experience) and declarations from two proposed intervenors who described six instances of discriminatory traffic enforcement from 2021-2024 and recounted how the BPD failed to investigate and respond to their discrimination complaints—further evidence of deliberate indifference. *See* Dkts. 287 (sealed) ¶¶ 14-20, 28-54; 326-5; 326-6.

The court ignored this evidence and failed to engage with Plaintiffs' arguments explaining the risk of harm was non-speculative because discriminatory traffic enforcement happens routinely, officers can easily invoke specious justifications for racially-motivated enforcement, and Plaintiffs cannot avoid discriminatory treatment by following the law. *See* Add. 6-7; Dkt. 327-1 at 15-16. The district court's "questionable" standing analysis necessitates reversal.

#### 3. The District Court Used the Wrong Criteria to Determine Ascertainability.

The determination that the Class is unascertainable, made explicit for the first time in the Order, also is incorrect. *See* Add. 7; *id.* 32. Ascertainability "requires only that a class be defined using objective

criteria that establish a membership with definite boundaries," *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017), such as "subject matter, timing, and location," *id.* at 269. The Class meets that requirement.

The Class is defined as "[a]ll Black and/or Latino individuals who have been or will be subjected to traffic stops, traffic tickets, and 'traffic safety' vehicle checkpoints by the BPD." Dkt. 211 at 3. This definition is objective because it describes a definite subset of drivers: those who are Black and/or Latino *and* subjected to certain conduct. Certified classes in other policing cases have employed similar definitions. *See, e.g.*, *Knox v. Salinas*, 193 F.3d 123, 125 (2d Cir. 1999) ("all New Haven residents who, on and after February 8, 1990, had their vehicles towed"); *Plaintiffs #1-21 v. County of Suffolk,* 2021 WL 1255011, at *9, 16 (E.D.N.Y. Mar. 12, 2021) ("[a]ll Latino or Latina persons who, at any time after January 2012, have been or in the future will be subject to a vehicular or pedestrian stop").

The district court did not assess whether the Class is defined by objective criteria but instead faulted the definition for failing to "specify a time period for class membership or specify a future duration for the proposed injunction," calling it "virtually limitless." Add. 7 (citing *id.* 32).

The Order cites no authority supporting this determination, and for good reason: Proposed classes may include future members, as the district court previously acknowledged (*id.* 32) and this Court has repeatedly held.[4] Nor does *Petrobras* require that a class definition specify the duration of a proposed injunction. Indeed, such a requirement would run counter to Rule 23 by importing requirements found nowhere in the text of the rule, much like the "administrative feasibility" doctrine rejected in *Petrobras*. 862 F.3d at 267. The district court erred by finding the class unascertainable.

#### 4. The District Court's Denial of Class Certification on Grounds that the Class Seeks an "Obey the Law" Injunction Violates Rule 23.

The district court also denied class certification because Plaintiffs "primarily requested an impermissible 'obey the law' injunction"—yet another criticism divorced from the text of Rule 23(b)(2). Add. 8.

Rule 23(b)(2) asks whether defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive

[4] *See, e.g.*, *Elisa W.*, 82 F.4th at 119 ("all children who are now or will be in … foster care custody"); *Barrows v. Becerra*, 24 F.4th 116, 130 n.54 (2d Cir. 2022) ("[a]ll Medicare beneficiaries who, on or after January 1, 2009 … have received or will have received" certain services); *Sykes v. Mel S. Harris & Assocs.*, 780 F.3d 70, 79 (2d Cir. 2015) ("all persons who have been or will be sued … and where a default judgment has been or will be sought").

relief … is appropriate respecting the class as a whole." Accordingly, the district court must assess whether "a single, indivisible remedy would provide relief to each class member." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 341 (2011). However, the relief to each class member "need not be identical," and "different class members can benefit differently from an injunction." *Barrows*, 24 F.4th at 132.

Plaintiffs seek specific injunctive remedies that are commonplace in civil rights cases. *See* Dkt. 241 at 10-15 (collecting examples). For example, Plaintiffs seek reforms to "training, supervision and discipline" that would end racially discriminatory traffic enforcement; and to require BPD to "document all traffic stops and vehicle Checkpoints in sufficient detail as to permit supervisory review … in a single, up-to-date computerized database." Dkt. 63 at 73-74. Not only do these requests go beyond a simple demand to "obey the law," but this Court has concluded that similar requests for injunctive relief satisfy Rule 23(b)(2) because they concern "acts and omissions of the [Defendant] that apply generally to the class." *Barrows*, 24 F.4th at 132; *see also Elisa W.*, 82 F.4th at 125 (ordering reforms to defendant's training protocols would benefit all class

members); *Hyland*, 48 F.4th at 119 (reforms to defendant's business practices would benefit plaintiffs in a wide variety of circumstances).

The district court failed to assess whether the specific relief Plaintiffs requested would benefit all Class Members at once. Instead, the court opined that it could not provide relief that Plaintiffs did *not* request, such as prohibiting "issuing tickets for motor vehicle violations" or determining whether specific tickets were justified or the product of racial discrimination. Add. 8. The court's refusal to contend with the actual relief Plaintiffs requested is questionable.

So, too, is the district court's focus on whether the relief demanded in the Amended Complaint, if issued without revision, would satisfy Federal Rule of Civil Procedure 65(d), which requires injunctions to "state [their] terms specifically" and "describe in reasonable detail the acts or omissions required." The only Second Circuit authority cited by the district court assessed the wording of a final injunction, not a motion for class certification. *See* Add. 8 (citing *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011)). Notably, Rule 23 does not require that injunctive relief be framed with a Rule 65 level of specificity, nor does any of this Court's Rule 23(b)(2) jurisprudence hold

Plaintiffs to such an exacting standard. To the contrary, this Court has approved certification of a 23(b)(2) class requesting an injunction that defendants "cease engaging in debt collection practices that violate the FDCPA, RICO, N.Y. GBL § 349, and N.Y. Jud. Law § 487" and "serve process in compliance with the law in any and all future actions." *Sykes*, 780 F.3d at 97. If this request passes muster at the class certification stage, so does Plaintiffs' here.

Nor would it make sense to hold a plaintiff to the standards applicable to final injunctive relief when seeking to certify a class. The commentary to Rule 23 contemplates that "proceedings to define the remedy" will occur "following a determination of liability." Fed. R. Civ. P. 23(c)(1) Advisory Committee's Note to 2003 Amendment. Should they prevail at trial, Plaintiffs expect to engage in a process to assist the court in fashioning a detailed injunction that fully complies with Rule 65(d). *See* Dkts. 241 at 9-10; 321 at 117-18; 327-1 at 12; 351 at 8; *see also* Add. 31 n.4. Requiring Plaintiffs to meet that standard at class certification, before any determination of liability, would be impossible given the requirement that injunctive relief redress only established violations. *Mickalis Pawn Shop*, 645 F.3d at 145.

Moreover, should the wording of an injunction be overly vague or broad, the remedy is to narrow the injunction, not to deny certification or dismiss the action. *E.g.*, *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) (vacating injunction and remanding to "recraft the paragraph more narrowly"). The district court is not bound by the wording in Plaintiffs' complaint when fashioning an injunction. *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 273-74 (2d. Cir. 2011) (noting district court's "wide range of discretion" including to order relief neither party requested).

**B. The District Court's Denial of Class Certification Is a Death Knell for the Class.**

By denying certification, the district court has "effectively terminated" the claims of the Class. *In re Sumitomo Copper Litig.*, 262 F.3d 134, 140 (2d Cir. 2001). The Class consists primarily of low-income individuals who receive *pro bono* representation in this matter, for whom private counsel would be "prohibitively expensive." *Id.* at 138. And the potential preclusive effect of the Order would deter any reasonable attorney from representing Class Members individually. This case is therefore one where "denial of class certification may sound the death knell for plaintiffs." *Microsoft Corp. v. Baker,* 582 U.S. 23, 29 (2017); *see*

*also Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1274 (11th Cir. 2000) (noting that whether a district court's ruling creates a "death knell" for claims of absent class members is often the "most important" consideration in determining whether to grant an interlocutory appeal); *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 150 (S.D.N.Y. 2015) (recognizing that denying class certification for a putative class seeking injunctive relief likely was a "death knell" appropriate for 23(f) review).

## II. The District Court's Order Implicates Legal Questions About Which There Is a Compelling Need for Resolution and Special Circumstances Warranting Review.

This petition raises at least three significant questions of class action law that would otherwise escape review and are cleanly presented for resolution. First, the Court should provide guidance as to whether motions to renew are governed by the plain language of Rule 23(c)(1)(C), as opposed to the exacting (and atextual) standards of motions to reconsider—an issue on which courts are split. *See Sleepy's*, 974 F.3d at 476 (describing disagreement). Second, the Court should make clear which date controls for standing purposes when a complaint and a motion for class certification are not simultaneously filed—a question that the Court has never directly addressed. Finally, this Court should clarify the

degree of specificity required for a request for injunctive relief at the class certification stage, including whether the requirements of Rule 65(d) have any bearing on class certification.

All three issues give this Court an opportunity to address "a legal question about which there is a compelling need for immediate resolution," *Sumitomo*, 262 F.3d at 139. Moreover, Plaintiffs' petition provides an especially compelling vehicle to address these questions given that this civil rights Class—which cannot continue absent review—is a "prime example[]" of what Rule 23(b)(2) "is meant to capture." *Wal-Mart Stores, Inc.*, 564 U.S. at 361 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). The Class faces immediate harm now, and final judgment could still be years away. Resolving the issues presented by this petition now will provide an efficient resolution for the Class and guide future litigation across the Circuit for years to come.

## CONCLUSION

This Court should grant the petition for leave to appeal.

Dated: April 14, 2026

Respectfully submitted,

/s/ *Claudia Wilner*
Claudia Wilner
NATIONAL CENTER FOR LAW AND ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, New York 10004
(212) 633-6967
wilner@nclej.org

Baher Azmy
A. Chinyere Ezie
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
bazmy@ccrjustice.org
cezie@ccrjustice.org

Philip A. Irwin
Jordan S. Joachim
Christine A. Nelson
Jacob T. Stark
COVINGTON & BURLING LLP
30 Hudson Yards
New York, New York 10001
(212) 841-1000
pirwin@cov.com
jjoachim@cov.com
cnelson@cov.com
jstark@cov.com

Matthew Alan Parham
WESTERN NEW YORK LAW CENTER
Cathedral Park Tower
37 Franklin Street, Suite 210
Buffalo, New York 14202
(716) 828-8415
mparham@wnylc.com

*Attorneys for Plaintiffs-Petitioners*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Federal Rule of Appellate Procedure 5(c)(1) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 5,190 words. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in size 14 font and Century Schoolbook style.

Dated: April 14, 2026

Respectfully submitted,

/s/ *Claudia Wilner*
Claudia Wilner

*Attorney for Plaintiffs-Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2026, a true and correct copy of the foregoing petition was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the ACMS system. Pursuant to Federal Rule of Appellate Procedure 25(c) and Second Circuit Local Rule 25.1(h)(3), I made service of this petition and accompanying documents via email on the following counsel:

Hugh M. Russ III, Esq.
Peter Sahasrabudhe, Esq.
Cheyenne N. Freely, Esq.
HODGSON RUSS LLP
*Attorneys for Defendants-Respondents*
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202
(716) 856-4000
hruss@hodgsonruss.com
psahasra@hodgsonruss.com
cfreely@hodgsonruss.com

Respectfully submitted,

/s/ *Claudia Wilner*
Claudia Wilner

*Attorney for Plaintiffs-Petitioners*

# ADDENDUM

## ADDDENDUM TABLE OF CONTENTS

**Page**

Opinion and Order Denying Plaintiffs' Motion to Reconsider or Renew the Motion to Certify the Traffic Enforcement Class and Denying Plaintiffs' Motion to Intervene Markel Nance and Thomas Christopher Williams, Jr. as Plaintiffs and Representatives of the Traffic Enforcement Class .......................... Add. 1

Opinion and Order Granting in Part and Denying in Part Plaintiffs' Motion to Certify Class ................................................ Add. 24

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DORETHEA FRANKLIN, TANIQUA SIMMONS, DE'JON HALL, JANE DOE, Individually and on behalf of a class of Others similarly situated, SHIRLEY SARMIENTO, EBONY YELDON, CHARLES PALMER, SHAKETA REDDEN, and JOSEPH BONDS, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:18-cv-00719 |
| CITY OF BUFFALO, N.Y., BYRON B. BROWN, Mayor of the City of Buffalo, in his individual and official capacities, BYRON C. LOCKWOOD, Commissioner of the Buffalo Police Department, in his individual capacity, DANIEL DERENDA, former Commissioner of the Buffalo Police Department, in his individual capacity, | ) | |
| Defendants. | ) | |

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION TO RECONSIDER OR RENEW THE MOTION TO CERTIFY THE TRAFFIC ENFORCEMENT CLASS AND DENYING PLAINTIFFS' MOTION TO INTERVENE MARKEL NANCE AND THOMAS CHRISTOPHER WILLIAMS, JR. AS PLAINTIFFS AND REPRESENTATIVES OF THE TRAFFIC ENFORCEMENT CLASS**
(Docs. 326 & 327)

## I. Procedural Background.

Plaintiffs Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, and Jasmine Evans bring this action against the City of Buffalo, New York (the "City"); former City of Buffalo Mayor Byron B. Brown; former Buffalo Police Department ("BPD") Commissioner

Byron C. Lockwood; and former BPD Commissioner Daniel Derenda (collectively, "Defendants") on behalf of themselves and other Black and Latino motorists in the City.[1]

Plaintiffs claim that the City has unlawfully targeted Black and Latino motorists through the use of administrative traffic checkpoints (the "Checkpoints"). Even after the Checkpoints were discontinued, they assert City police officers continue to systematically target Black and Latino motorists for traffic enforcement, fines, and penalties. Plaintiffs allege violations under the Fourth Amendment, Fourteenth Amendment Equal Protection Clause, Fourteenth Amendment Due Process Clause, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d).

Plaintiffs filed an amended class action complaint ("Amended Complaint"), (Doc. 63), on May 21, 2020, and a motion for class certification on May 29, 2024. (Doc. 202.) On April 22, 2025, the court certified two distinct classes: (1) a "Checkpoint Class"[2] and (2) a "Tinted Windows Class".[3] (Doc. 261.) The court denied certification for a third class, the "Traffic Enforcement Class," finding the class lacked standing, was unascertainable, and the injunctive relief primarily requested an "obey the law" injunction. *Id.* Only that decision is at issue in Plaintiffs' motion for reconsideration.

Plaintiffs define the Traffic Enforcement Class as: "All Black and/or Latino individuals who have been or will be subjected to traffic stops, traffic tickets, and 'traffic safety' vehicle checkpoints by the BPD." *Id.* Alternatively, they characterize the class as "Black individuals who plan to continue to drive in the City of Buffalo[.]" (Doc. 327-1 at 15.)

---

[1] On October 3, 2025, the court granted Plaintiffs' consent motion to dismiss Black Love Resists in the Rust as a plaintiff and to dismiss claims against Defendants Young, Brinkworth, Serafini, Thomas, and the Unknown Defendants. (Doc. 349.)

[2] Plaintiffs define the Checkpoint Class as: "All individuals who received a ticket or were arrested at a BPD 'traffic safety' vehicle checkpoint on or after June 28, 2015." (Doc. 211 at 12.)

[3] Plaintiffs define the Tinted Windows Class as: "All Black and/or Latino individuals who received multiple tinted windows tickets from the BPD in a single traffic stop on or after June 28, 2025." *Id.*

Plaintiffs seek a declaration that Defendants have violated Plaintiffs' constitutional rights and a class-wide injunction mandating significant changes in Defendants' policies, practices and/or customs, as well as an award of monetary damages, attorneys' fees, and costs.

On July 11, 2025, Plaintiffs filed a motion to reconsider the denial of the motion to certify the Traffic Enforcement Class pursuant to Fed. R. Civ. P. 54(b) or, in the alternative, to renew the motion to certify pursuant to Fed. R. Civ. P. 23(c)(1)(C). (Doc. 327.) Simultaneously, Plaintiffs filed a motion to intervene Markel Nance and Thomas Christopher Williams, Jr. (collectively, the "Proposed Intervenors") as plaintiffs and representatives of the Traffic Enforcement Class, seeking either mandatory or permissive intervention in this class action pursuant to Fed. R. Civ. P. 24. (Doc. 326.) Defendants opposed both motions on September 26, 2025, (Doc. 338), and Plaintiffs filed a reply on October 10, 2025. (Doc. 351.) A hearing was held on October 17, 2025, at which time the court took the pending motions under advisement.

Plaintiffs are represented by Andrea Chinyere Ezie, Esq., Baher Azmy, Esq., Christine Adrienne Nelson, Esq., Claudia Wilner, Esq., Joseph A. Kelemen, Esq., Matthew Alan Parham, Esq., Philip A. Irwin, Esq., and Jordan Scott Joachim, Esq. Defendants are represented by Peter A. Sahasrabudhe, Esq., Robert Emmet Quinn, Esq., Cheyenne Nicole Freely, Esq., and Hugh M. Russ, III, Esq.

## II. Plaintiffs' Motion for Reconsideration.

### A. Standard of Review.

The standard for reconsideration in the Second Circuit is an exacting one. "[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Id.* A party may "obtain relief only when the [party] identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or

Case: 26-968, 04/14/2026, DktEntry: 1.1, Page 43 of 90

prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 108 (2d Cir. 2013) (internal quotation marks and citation omitted).

Plaintiffs contend that reconsideration is warranted because the court's standing analysis contained two errors: (1) the court incorrectly limited its standing analysis to Checkpoints and (2) it evaluated injunctive standing based on recent events rather than as of the date individual plaintiffs joined the action.

**B. Whether the Court Incorrectly Limited Its Standing Analysis.**

The court did not limit its standing analysis to Checkpoints. It instead considered allegations from Plaintiffs concerning "multiple traffic citations unrelated to Checkpoints." (Doc. 261 at 11.) The court recounted allegations from a 2017 traffic stop and 2019 and 2022 tickets issued while vehicles were parked in BMHA-owned parking lots. The court noted that "[a]ll of these incidents refer to past harm." *Id.* The court also considered Plaintiffs' non-Checkpoint claims when determining whether Plaintiffs could establish standing based on statistical disparities. *See id.* at 12 ("To the extent Plaintiffs rely on evidence that non-white motorists are statistically more likely to receive a traffic infraction ticket than white motorists, . . . this evidence also reflects past alleged harms . . . [and] does not rise to a real and immediate threat of future injury.") (internal quotation marks and citation omitted). Because Plaintiffs mischaracterize the court's decision as limiting its standing analysis to Checkpoints, it will not reconsider its previous decision on this basis.

**C. Whether the Court Evaluated Injunctive Standing Using the Incorrect Date.**

To support their second argument in favor of reconsideration, Plaintiffs cite Second Circuit precedent that "'standing is to be determined as of the commencement of suit,' even for plaintiffs seeking forward-looking relief." *Doe v. McDonald*, 128 F.4th 379, 384 (2d Cir. 2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Plaintiffs do not allege that each individual plaintiff's claims relate back to the date of original filing but, rather, assert that "standing for new plaintiffs is governed by the date on which they sought leave to join the action[,]" which Plaintiffs contend is June 28,

Case: 26-968, 04/14/2026, DktEntry: 1.1, Page 44 of 90

2018, the date the action was commenced, for Plaintiffs Simmons, Franklin, Evans, and Hall, and April 23, 2020, the date of the motion for leave to file an amended and supplemental complaint, for Plaintiffs Bonds, Yeldon, Sarmiento, and Redden.[4] (Doc. 327-1 at 18.)

Plaintiffs rely on two Second Circuit cases for their contention that the filing date of the original complaint and any amended complaint are the appropriate dates by which to evaluate standing, *Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993) and *Comer v. Cisneros*, 37 F.3d 775, 791 (2d Cir. 1994). In *Robidoux*, applicants for Vermont public assistance benefits brought an action challenging delays in the processing of their applications. Robidoux filed the complaint and motion for class certification on the same day. Other named plaintiffs later moved to intervene. At the time of both filings, the plaintiffs had not yet received their benefits. The district court denied the motion for class certification two months later. The Second Circuit found that the lower court erred in denying the motion for class certification because "at the material time," which the court determined was the date Robidoux filed her complaint, the injury was "capable of being redressed by declaratory or injunctive relief[.]" 987 F.2d at 938. In *Comer*, the plaintiffs moved for class certification less than two months after filing their complaint. And while the Second Circuit in *Comer* held that class certification would relate back to the date of the original filing, it did so by noting the district "court's failure to pass upon the plaintiffs' motion for class certification for over two years[.]" 37 F.3d at 799.

Defendants rely on *Jobie O. v. Spritzer*, 2007 WL 4302921 (S.D.N.Y. Dec. 5, 2007), to support their claim that "[w]here, as here, a complaint and a motion for class certification are not filed simultaneously, the timing of the motion for class certification is the material time for determining whether plaintiffs have standing." (Doc. 338 at 11.) In *Jobie O.*, the plaintiff intervened in the case in June 2006 and moved for class certification a year later in July 2007. Finding the plaintiff lacked standing in July 2007,

[4] Plaintiffs' motion did not mention Plaintiff Palmer, but he was added to the amended and supplemental complaint.

Case: 26-968, 04/14/2026, DktEntry: 1.1, Page 45 of 90

the court denied the motion for class certification. In doing so, the district court described the likelihood of future harm as too speculative and dependent upon a series of inferences that the plaintiff "would again become incarcerated in a New York City jail as a parole detainee for an excessive amount of time, awaiting an opening in a suitable MICA program[,]" placement in which was discretionary. *Jobie O.*, 2007 WL 4302921, at *15.

Plaintiffs oversimplify the *Jobie O.* court's ruling by characterizing it as predominantly a mootness analysis. As the court noted, "Because Mr. O. was no longer suffering the injury for which he seeks injunctive relief at the time he moved for class certification, *in order to have standing*, he would need to show that the threat of him suffering from the same injury is '"real and immediate," not "conjectural," or "hypothetical."'" *Id.* at *14 (emphasis supplied) (quoting *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)). The court distinguished *Comer*, noting it was the plaintiff's failure to file a motion for class certification, not the court's failure to render a decision, that caused the individual plaintiff's claim to become moot. The court also distinguished *Robidoux*, because there the plaintiff filed the motion for class certification a year after his motion to intervene, rather than on the same day. In deciding the operative date for establishing standing, the *Jobie O.* court relied on *White v. Mathews*, 559 F.2d 852 (2d Cir. 1977), wherein the court "suggested that 'the material time' was the date on which the motion for class certification was filed[,]" which controls "when the complaint and the motion for class certification are *not* filed simultaneously[.]" *Jobie O.*, 2007 WL 4302921, at *11 (emphasis in original). In *White*, the Second Circuit evaluated standing for the class as of the date when the named plaintiff "*moved to certify the class* and still had not received a hearing[.]" 559 F.2d at 857 (emphasis supplied).

Plaintiffs filed their motion for class certification six years after their initial complaint. Even if the filing date for the class certification motion was the operative date, the standing analysis would remain unchanged because every Plaintiff and every Proposed Intervenor for the Traffic Enforcement Class alleges infrequent and past harm. Like the plaintiff in *Jobie O.*, their risk of future harm depends upon a speculative chain of inferences based upon a belief that if they continue to drive in Buffalo, they will suffer

discriminatory treatment after they either commit or do not commit a traffic infraction. This type of harm is unparticularized, impossible to redress through a narrowly tailored injunction,[5] and would require an individualized evidentiary analysis of each traffic stop that took place for all Black and Latino drivers, anywhere in Buffalo, for eternity. The court declined to find an imminent risk of concrete, non-speculative, irreparable harm based on those facts.

In denying class certification, the court further found that the Traffic Enforcement Class was unascertainable because it "is virtually limitless because it does not specify a time period for class membership or specify a future duration for the proposed injunction[,]" (Doc. 261 at 9), and because it would encompass every Black and Latino driver who planned to drive in the City. The practices Plaintiffs sought to enjoin other than the Checkpoints, which were discontinued as of the filing of their motion, were similarly unascertainable and amorphous and consisted of alleged discriminatory traffic enforcement writ large as opposed to specific, discrete practices.[6] Enforcement of and

---

[5] "An injunction is a drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), that must be narrowly tailored to redress a particularized and non-speculative harm. *See, e.g.*, *Forschner Grp., Inc. v. Arrow Trading Co. Inc.*, 124 F.3d 402, 406 (2d Cir. 1997) (requiring the court "to grant relief no broader than necessary to cure the effects of the harm caused by the violation[]"); *Transamerica Rental Fin. Corp. v. Rental Experts*, 790 F. Supp. 378, 382 (D. Conn. 1992) ("In fashioning an injunction, the court should make the relief as narrow as required to attain the desired result.").

[6] Plaintiffs sought class certification under Fed. R. Civ. P. 23(a) and 23(b)(2) for the Traffic Enforcement Class. "Rule 23(b)(2) allows class treatment when 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). "The key to the (b)(2) class is 'the indivisible nature of the injunctive . . . remedy warranted—the notion that the conduct is such that it can be enjoined . . . only as to all of the class members or as to none of them.'" *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). "In other words, Rule 23(b)(2) applies only when a single injunction . . . would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction . . . against the defendant." *Id.* (emphasis in original).

Although "'civil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture[,]" *id.* at 361 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997), the practices the Traffic Enforcement Class seeks to

compliance with such an injunction would, among other things, require law enforcement to make assumptions regarding a vehicle operator's race and may require intervention at every turn. The court could not prohibit law enforcement from issuing tickets for motor vehicle violations, nor could it micromanage how those interactions took place, including whether the operator was Black or Latino, whether a traffic stop or other enforcement mechanism was justified, whether the fines imposed or other consequences were merited by the severity of the infractions, and whether the encounter as a whole was lawful or discriminatory. Plaintiffs cite no precedent for issuing an injunction of that nature.

Finally, in denying class certification, the court determined that the Traffic Enforcement Class primarily requested an impermissible "obey the law" injunction. *Id.* at 9; *see also City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (alteration adopted) (finding that injunctions that "impose[d] on defendants an obligation to act 'in full conformity with applicable laws pertaining to firearms,' and to 'adopt appropriate prophylactic measures to prevent violation' of those laws[]" failed under Rule 65(d)); *Wakefield v. Scott*, 2021 WL 10342467, at *4 (D. Vt. June 24, 2021) (noting plaintiff's claims for injunctive relief failed "because her request for a command to 'direct defendants from violating the law' did not comply with Federal Rule of Civil Procedure 65(d) and Second Circuit precedent requiring that an injunction be more specific than a simple command that the defendant obey the law[]") (citation omitted)). All of these concerns remain and have little to nothing to do with the date of the court's standing analysis.

Because Plaintiffs have failed to satisfy the exacting standard for reconsideration, their motion for reconsideration is DENIED.

**III. Plaintiffs' Motion to Intervene.**

Plaintiffs claim that new evidence in the form of a motion to intervene provides a basis for reconsideration because the Proposed Intervenors have had more recent

---

enjoin are as varied as the number of traffic infractions in the NYSVTL, rendering each individual class member "entitled to a *different* injunction[.]" *Id.* at 360 (emphasis in original).

experiences of what they allege are racist and discriminatory traffic stops and other encounters with law enforcement. They also cite what they claim is new statistical evidence that bolsters their claim of racial disparities in policing that can only be explained by racial discrimination.[7]

Defendants point out that both the intervenors and the statistical evidence are not new; both were reasonably available when Plaintiffs filed their motion for class certification or shortly thereafter, and the allegedly new evidence cures none of the deficiencies the court identified in denying certification to the Traffic Enforcement Class.

**A. Proposed Intervenors' Factual Allegations.**

The following facts are taken from Proposed Intervenors' Class Action Complaint in Intervention. (Doc. 326-3.)

**1. Mr. Nance.**

Markel Nance is a 25-year-old Black male and Buffalo resident. On May 22, 2021, around 4:00 a.m., Mr. Nance was pulled over by the BPD on his way home with his girlfriend while driving a luxury vehicle. The BPD officer, who is White, told Mr. Nance he stopped him for speeding, which the officer measured using his own cruiser's speed. The BPD officer instructed Mr. Nance to exit his vehicle, patted him down for weapons, and placed him in the back of the patrol car. Mr. Nance contends that the officer had no basis for the pat down or to detain him in the patrol car.

During the traffic stop, the BPD officer spoke to Mr. Nance "in a demeaning manner, addressing him as 'my man,' 'my guy,' and 'dog.'" *Id.* at 5, ¶ 14. In response to Mr. Nance requesting a lieutenant, the BPD officer called Mr. Nance a "smartass[]" and accused him of being racist. *Id.* at ¶ 17 (internal quotation marks omitted). "When Mr. Nance responded that he could[ not] be racist because he is Black, [the officer] responded, 'Must be nice.'" *Id.* at ¶ 18. The officer also allegedly "commented that his supervisor 'is Black, so you guys will have a great conversation.'" *Id.* Mr. Nance was

[7] To the extent Plaintiffs developed additional statistical evidence after the court's hearing on class certification, they never requested to supplement the record with it.

issued three tickets for "speed not reasonable and prudent," and failing to observe a traffic signal, which were allegedly unjustified, as well as unlicensed operation. *Id.* at 6, ¶ 19 (internal quotation marks omitted). At the conclusion of the traffic stop, the officer told Mr. Nance "'[p]eace out homie,' and flashed a peace sign[.]" (Doc. 325-3 at 6, ¶ 20.)

Mr. Nance reported the encounter to the BPD's Internal Affairs Division ("IAD") as a racially discriminatory traffic stop. IAD interviewed Mr. Nance but not his girlfriend, who witnessed the stop. IAD told Mr. Nance in a letter that "the Police Commissioner would determine what disciplinary action the officer should face, though [Mr. Nance] was never informed if any such disciplinary action was taken." *Id.* at ¶ 22.

On January 6, 2022, Mr. Nance had another encounter with BPD while driving a rental car. As Mr. Nance drove by BPD officers conducting a different traffic stop, his passenger placed his head out the rental car's window. The officers pulled Mr. Nance over, questioned him about whether his name was on the rental agreement, and issued him four tickets. One ticket was for unlicensed operation. Mr. Nance had a valid license but had only a learner's permit in his possession at the time. The officers also cited him for failing to stop at a stop sign, which Mr. Nance asserts is false. Upon telling the officers he was going to file a complaint with IAD, an officer allegedly responded, "Go to IA. I don't give a f[**]k. What are they going to do?" *Id.* at 7, ¶ 25 (internal quotation marks omitted). Mr. Nance filed a complaint with IAD, which did not interview a witness to the stop or inform Mr. Nance of the outcome of any investigation.

Mr. Nance was pulled over again while driving a rental car in March 2022. The BPD officer told Mr. Nance he did not come to a complete stop at the stop sign, which Mr. Nance claims is untrue. He was issued a ticket for failure to stop. Mr. Nance contested this ticket in court and the case was dismissed.

On November 24, 2023, Mr. Nance was stopped by BPD officers on his way home after passing around a turning car. Two officers made a U-turn and pulled him over before two additional officers arrived. The officers "asked [Mr. Nance] to exit his car [and] then placed him in the back of the patrol car while they searched his car without justification

or permission." *Id.* at 8, ¶ 29. After the search, they "issued him two tickets for imprudent speed and unsafe lane movement and told him he was free to go." *Id.*

Mr. Nance was pulled over again in March 2024. He does not provide information about the operation that initiated this encounter, but he alleges he was issued "six tickets, including two misdemeanors, for [his] single insurance lapse." *Id.* at ¶ 30.

**2. Mr. Williams.**

Thomas Christoper Williams, Jr. is a 20-year-old African American male who was born and raised on the East Side of the City and continues to live and study in the City.

On March 26, 2024, around 11:30 p.m., Mr. Williams was waiting at a traffic light when a BPD officer driving in the opposite direction "looked at him with a hostile expression that made Mr. Williams fear for his life and then proceeded to make a U-turn and pulled up behind Mr. Williams." (Doc. 326-3 at 9, ¶ 36.) Mr. Williams drove home and the BPD officers, both of whom are White, followed him, turned into his driveway, activated their lights, and "barricad[ed] his car in the driveway." *Id.* at ¶ 37. The officers approached Mr. Williams and asked, "You live here, brother?" *Id.* at ¶ 38 (internal quotation marks omitted). Mr. Williams stated that he did and provided the officers with his license, registration, and insurance information, as well as his father's business card indicating his father was a Sergeant with the Police Department of Anne Arundel County, Maryland.

The officers questioned Mr. Williams about a variety of matters, including "what he was doing, where he was coming from, whether he lived in [the] house, and why he was[ not] wearing a coat[,]" as well as "his gym, his school, his areas of study, his grades, why he was nervous, and if the car was stolen[.]" *Id.* at 10, ¶ 40. They also asked him if he had warrants or had been on probation or parole. He told them "no" and they told him "they had to run his license." *Id.* Despite holding his license, they called him by the wrong name, "James." *Id.* (internal quotation marks omitted).

The officers advised Mr. Williams that "they just had one of these cars stolen and that Mr. Williams 'scared' the officer by pulling into his driveway[.]" (Doc. 326-3 at 10, ¶ 41.) The officers gave different reasons for the stop, including that Mr. Williams had not

used his directional signal when turning into his driveway, "that he had pulled all the way into his driveway and appeared nervous, and that they were not sure if he lived in the house." *Id.* at ¶ 42. They later also claimed that he was speeding before turning into the driveway.

As the officers continued to question Mr. Williams, his mother and aunt came out of the house. Mr. Williams's mother confirmed that he was her son, he lived at the house, and the car was not stolen. Mr. Williams's mother called Mr. Williams's father, who also confirmed to the officers that Mr. Williams was his son and was driving the family car. Despite these representations from Mr. Williams's parents, the officers "r[a]n Mr. Williams['s] name and license" and checked for warrants. *Id.* at 11, ¶ 44. They neither ticketed Mr. Williams nor issued him a stop receipt. Mr. Williams claims there was "no legal basis to prolong the stop to run a background check and ask extensive questions unrelated to the stop[.]" *Id.* at ¶ 45.

Following this encounter, Mr. Williams and his family met with E District Chief Todd McAllister regarding their concerns that the traffic stop was racially discriminatory. Chief McAllister allegedly acknowledged that the vehicle driven by Mr. Williams was not the same make or model of any reports of stolen cars that evening and "told them that it was an unfair and bad stop, that the officers did a lot of things wrong, and that they should not have stopped Mr. Williams or pulled into his driveway." *Id.* at 12, ¶ 48. He "described how the E District has had a racial profiling problem in part because . . . there are no Black officers who work at night[.]" *Id.* at ¶ 49. Chief McAllister said he would file a racial discrimination complaint with IAD. Six weeks later, IAD conducted short interviews of Mr. Williams and his father, lasting approximately ten and four minutes, respectively. The interviewer "used an indifferent and curt tone[.]" (Doc. 326-3 at 12, ¶ 50.) At the end of the investigation, all the officers involved were exonerated.

On September 21, 2024, two BPD police cars "sandwiched" a convertible BMW M8, worth over $100,000, in which Mr. Williams and one other Black male were passengers, with one police car in front and one behind the car. *Id.* at 14, ¶ 56. The officers claimed the operator, who was Mr. Williams's brother, did not stop at a stop sign.

The four White officers commented on how expensive the car was and asked the operator who it belonged to and how he got it. They asked everyone for their driver's licenses, and one officer told Mr. Williams he looked familiar despite Mr. Williams having never previously encountered the officer. Mr. Williams describes this encounter as a pretextual and discriminatory stop.

**B. Standard of Review.**

Mr. Nance and Mr. Williams seek to intervene as of right pursuant to Fed. R. Civ. P. 24(a)(2) or, in the alternative, request permissive intervention pursuant to Fed. R. Civ. P. 24(b). Defendants oppose the motion, arguing it is untimely and futile because Proposed Intervenors lack standing.

Pursuant to Rule 24(a)(2), a court "must permit anyone to intervene" if that party "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). A party seeking to intervene as of right must "(1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 128-29 (2d Cir. 2001) (internal quotation marks omitted). "Failure to satisfy *any one* of these requirements is a sufficient ground to deny the application." *In re Bank of N.Y. Derivative Litig.*, 320 F.3d 291, 300 (2d Cir. 2003) (emphasis in original) (internal quotation marks omitted).

If intervention as of right is not warranted, "[a] district court may grant a motion for permissive intervention if the application is timely and if the 'applicant's claim or defense and the main action have a question of law or fact in common.'" *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 202 (2d Cir. 2000) (quoting Fed. R. Civ. P. 24(b)(2)). "The court considers substantially the same factors whether the claim for intervention is 'of right' under Fed. R. Civ. P. 24(a)(2), or 'permissive' under Fed. R. Civ. P. 24(b)(2)." *R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*, 467 F.3d 238, 240 (2d Cir. 2006).

**C. Whether the Motion to Intervene is Timely.**

"A district court has broad discretion in assessing the timeliness of a motion to intervene[.]" *Holocaust Litig.*, 225 F.3d at 198.

> Timeliness defies precise definition, although it certainly is not confined strictly to chronology. Among the circumstances generally considered are: (1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness.

*United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994); *see also Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 182 (2d Cir. 2001). "Generally, the court's analysis must take into consideration the totality of the circumstances." *Holocaust Litig.*, 225 F.3d at 198.

This case has been pending since June 28, 2018. As Defendants point out, Proposed Intervenors have had a purported interest in this case since its inception in 2018, their alleged experiences of racial discrimination took place years ago, and Plaintiffs waited "three months after the Class Certification ruling and until the tail-end of summary judgment briefing to move to intervene." (Doc. 338 at 19.) The deadline for joinder of parties was May 14, 2020. *See* Doc. 48. The court agrees that, against this backdrop, Plaintiffs' motion to intervene is not timely and will result in both unreasonable delay and prejudice to Defendants.[8]

**1. Notice.**

With respect to notice, the relevant inquiry is when an intervenor "became aware that its interest would no longer be adequately represented." *Nat'l Fuel Gas Distrib. Corp. v. Templeton Energy, Inc.*, 1986 WL 12486, at *1 (W.D.N.Y. Nov. 7, 1986). In some cases, the filing of the complaint serves as that triggering event. However, "[i]n cases where the potential intervenor's interest is, at least at the outset, subsumed by that

[8] Pending before the court is Defendants' motion for summary judgment (Doc. 252) and Plaintiffs' motion for partial summary judgment, (Doc. 253), both of which have been fully briefed and argued and for which the record exceeds five hundred pages and six hundred exhibits.

of a representative litigant, the trigger requiring intervention does not occur until it is apparent that the representative no longer protects the intervenor's interest." *Chen-Oster v. Goldman, Sachs & Co.*, 2015 WL 4619663, at *6 (S.D.N.Y. Aug. 3, 2015). Class actions are one such circumstance, "for as long as the interests of class members are fully represented by the named plaintiffs, there is no incentive, and therefore no obligation, to intervene." *Id.* Prior to certification, potential class members are "mere passive beneficiaries of the action brought in their behalf." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 552 (1973).

> Not until the existence and limits of the class have been established and notice of membership has been sent does a class member have any duty to take note of the suit or to exercise any responsibility with respect to it in order to profit from the eventual outcome of the case.

*Id.* For this reason, the Supreme Court has allowed post-judgment intervention by a class member when the named plaintiffs declined to appeal a denial of class certification. *See United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977) ("In short, as soon as it became clear to the respondent that the interests of the unnamed class members would no longer be protected by the named class representatives, she promptly moved to intervene to protect those interests.").

In this case, the Proposed Intervenors' interests were previously represented and protected by the named plaintiffs seeking class certification and injunctive relief on behalf of the Traffic Enforcement Class. Indeed, as Defendants repeatedly point out, the Proposed Intervenors' interests are identical to those individuals they seek to replace even if based on widely divergent fact patterns. Proposed Intervenors' interests did not become unrepresented by class members who refused to advocate on their behalf. Instead, they apparently claim they will be better suited as class representatives for purposes of standing because their police encounters were more numerous and more recent. Plaintiffs proffer no explanation as to why these class representatives were not previously chosen. Because Plaintiffs had notice of the need for adequate class representatives who had standing, Proposed Intervenors could have been chosen as class representatives much

earlier in the case. The court's denial of class certification did not create that need nor does it render their motion timely.[9]

### 2. Prejudice to Existing Parties.

Prejudice has been found where potential intervenors sought to "radically change the definition of the proposed class[,]" *Allen v. Dairy Farmers of Am., Inc.*, 2011 WL 1706778, at *6 (D. Vt. May 4, 2011), or where intervention threatened to destroy the settlement reached by the parties and "send[] them back to the drawing board." *Holocaust Litig.*, 225 F.3d at 199; *see also Sheppard v. Phoenix*, 1998 WL 397846, at *2 (S.D.N.Y. July 16, 1998) ("To abort the [s]ettlement at this process, at this late critical stage would prejudice the parties to this litigation."). This action has been pending for seven years. The parties have conducted extensive discovery. Until April 2025, the action proposed a Traffic Enforcement Class for whom solely injunctive relief was sought. As admitted by Plaintiffs, Proposed Intervenors incorporate "the same allegations as Plaintiffs have already made in this action, and they seek the same relief." (Doc. 326-1 at 15) (emphasis omitted). Intervention is effectively an offshoot of Plaintiffs' motion to reconsider, with the proposed intervention characterized as quasi-new evidence which the court must reconsider. As Defendants assert, intervention "would set this case back to the discovery phase[]" and "add, at a minimum, six months to this action" as they "gather paper discovery on the Proposed Intervenors and depose them." (Doc. 338 at 20.) Defendants have therefore established they will suffer unfair prejudice if the motion to intervene is granted.

---

[9] Courts generally expect an intervenor to act promptly upon receipt of notice. *See, e.g.*, *Pike Co. v. Universal Concrete Prods., Inc.*, 284 F. Supp. 3d 376, 394-96 (W.D.N.Y. 2018) (finding motion to intervene was timely when filed within approximately five months of receiving notice); *Range v. Nat'l R.R. Passenger Corp.*, 176 F.R.D. 85, 88-89 (W.D.N.Y. 1997) (holding motion to intervene was timely when filed less than three months after notice); *cf. United States v. New York*, 820 F.2d 554, 557 (2d Cir. 1987) (finding untimely a motion to intervene that was filed fifteen months after proposed intervenor knew or should have known of his interest in the case).

**3. Prejudice to Applicants.**

The Second Circuit has held that if intervenors "remain free to file a separate action, they have not established that they will be prejudiced if their motion to intervene is denied." *Holocaust Litig.*, 225 F.3d at 199. Even where they may face "many significant obstacles" in filing their own lawsuit, permission to intervene need not be granted. *Id.* Plaintiffs argue that Proposed Intervenors "would be greatly prejudiced by a denial of their motion[]" as a result of inefficiency and duplicative work that intervention would prevent. (Doc. 326-1 at 15.) Nothing prevents Proposed Intervenors from filing their own lawsuit against Defendants, however, and mere inconvenience does not suffice to establish prejudice.

**4. Unusual Circumstances.**

Neither Defendants nor Proposed Intervenors have identified any unusual circumstances to militate for or against a finding of timeliness.

**D. Whether Intervention is Futile.**

An additional threshold consideration, however, is whether intervenors have standing. If intervenors lack standing, the motion to intervene would be futile and denial appropriate. *See, e.g.*, *Dynamic Sys., Inc. v. Skanska USA Bldg. Inc.*, 2021 WL 6063609, at *2 (S.D.N.Y. Dec. 21, 2021) ("[C]ourts have held that futility is a proper basis for denying a motion to intervene.") (internal quotation marks and citation omitted); *N.Y. Life Ins. Co. v. Sahani*, 730 F. App'x 45, 50 (2d Cir. 2018) (affirming denial of motion to intervene based on futility); *Cross Sound Cable Co. v. Long Island Lighting Co.*, 2022 WL 247996, at *6 (E.D.N.Y. Jan. 27, 2022) (denying motion to intervene as futile because underlying claim did not confer subject matter jurisdiction or standing and would have been untimely).

**1. Proposed Intervenors' Standing.**

The Supreme Court is clear that "standing is not dispensed in gross." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (internal quotation marks and citation omitted). "To the contrary, 'a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'" *Id.* (quoting *Davis v. Fed.*

*Election Comm'n*, 554 U.S. 724, 734 (2008)); *see also Los Angeles v. Lyons*, 461 U.S. 95, 106 n.7 (1983) (a plaintiff who has standing to seek damages must also demonstrate standing to pursue injunctive relief). "The same principle applies when there are multiple plaintiffs. At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester*, 581 U.S. at 439.

Proposed Intervenors seek to preliminarily and permanently enjoin Defendants:

> (a) From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints in a manner that targets Buffalo residents on the basis of their race and ethnicity;
>
> (b) From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints for improper pecuniary purposes;
>
> (c) To institute and implement policies and programs with respect to training, supervision, and discipline that will eliminate the policy, pattern, practice, and custom of:
>
> > (i) conducting vehicle Checkpoints for the purpose of general crime control; and
> >
> > (ii) enforcing traffic laws in a manner that targets Buffalo residents on the basis of their race and ethnicity or that reflect an improper pecuniary motive[;]
>
> (d) To implement appropriate measures to ensure that BPD officers and personnel document all traffic stops and vehicle Checkpoints in sufficient detail as to permit supervisory review for compliance with the Fourth and Fourteenth Amendments and Title VI of the Civil Rights Act;
>
> (e) To implement appropriate measures to ensure that documentation of all traffic stops and vehicle Checkpoints is retained in a single, up-to-date computerized database.

(Doc. 326-3 at 19, ¶ 77.)

The court previously determined that the requested injunctive relief primarily consists of an impermissible "obey the law" injunction. The court further found Plaintiffs lacked standing—not based upon the timing of their complaint or motion for class certification—but based upon their reliance on past, infrequent harm to establish imminent, irreparable, and non-speculative future harm.

Plaintiffs contend that Proposed Intervenors have standing because they have "been subject to a recent discriminatory traffic stop or ticketing by the BPD pursuant to

an ongoing municipal policy, custom, or practice targeting Black and Latino motorists on the basis of race[.]" (Doc. 326-1 at 21.) They do not deny, however, that the Proposed Intervenors allege past harm as well as the same harm as the class representatives they seek to replace.

In his declaration, Mr. Nance states that he was subjected to discriminatory stops by the BPD approximately once a year in 2021, 2022, 2023, and 2024. He asserts that, in each instance, he was targeted and ticketed because he was a Black man, citing what he contends is racially demeaning language.

Mr. Williams declared that he was subjected to two traffic stops by the BPD in 2024. In one encounter, two BPD officers allegedly followed Mr. Williams home and unjustifiably barricaded his car in his driveway and interrogated him. In another encounter, the BPD stopped a car in which Mr. Williams was a passenger and his brother was driving. The officers commented on how expensive the car was, questioned Mr. Williams, and asked for everyone's driver's licenses.

In *Floyd v. City of New York*, the Southern District of New York found that a plaintiff seeking an injunction mandating changes to New York City's stop and frisk program had standing because (1) the plaintiff had been stopped and frisked four separate times; (2) the plaintiff's "future injury does not depend on his being arrested for unlawful conduct and so he cannot avoid that injury by following the law"; and (3) "the frequency of alleged injuries inflicted by the practices at issue here creates a likelihood of future injury[.]"[10] 283 F.R.D. 153, 169-70 (S.D.N.Y. 2012). *Floyd* is not controlling precedent.

The challenged governmental policy at issue in *Floyd* was ongoing at the time of the lawsuit, involved a specific policy and practice of stop and frisk unrelated to

[10] The district court had previously "declar[ed] the Street Crime Unit's ('SCU') practice and/or custom of suspicionless stops and frisks to be unconstitutional." *Nat'l Cong. for Puerto Rican Rts. v. City of New York*, 75 F. Supp. 2d 154, 158 (S.D.N.Y. 1999). The court found the individual plaintiffs had established standing because: (1) "there is [a] difference in the number of alleged constitutional violations resulting from the challenged policies"; (2) the victims "claim they have been victimized by [the] unconstitutional practices repeatedly"; and (3) "there is no chain of contingencies making the threat of future harm speculative. . . . [P]laintiffs do not have to break the law to be exposed to the alleged constitutional violations." *Id.* at 161.

reasonable suspicion or probable cause, and of the four instances in which the plaintiff had been stopped, three were in the same year as the request for injunctive relief.

Proposed Intervenors allege that the BPD policy of targeting Black and Latino motorists for traffic enforcement is ongoing. However, neither the recency nor the frequency found in *Floyd* is present in this case, traffic enforcement with regard to motor vehicle operators of designated racial backgrounds cannot be entirely enjoined, a discrete practice or policy is not at issue, and past allegations of harm once or twice a year two to four years ago do not "create[] a likelihood of future injury[.]" *Id.* at 170. In addition, unlike in *Floyd*, the alleged constitutional violations are not subject to targeted injunctive relief. Instead, Proposed Intervenors cite widely divergent fact patterns and ask the court to either enjoin those fact patterns in the future or issue a broad "obey the law" injunction.

Because neither Proposed Intervenor has established that he is "immediately in danger of sustaining some direct injury as the result of the challenged official conduct[,]" *Shain*, 356 F.3d at 215 (internal quotation marks omitted) (quoting *Lyons*, 461 U.S. at 101-02), Proposed Intervenors have failed to established standing for injunctive relief, and intervention would be futile.

For the reasons stated above, Plaintiffs' motion to intervene as of right is therefore DENIED. For the same reasons, Plaintiffs' motion for permissive intervention is DENIED. *See Town of Chester*, 581 U.S. at 439-40.

## IV. Plaintiffs' Motion to Renew.

### A. Standard of Review.

Fed. R. Civ. P. 23(c)(1)(C) provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment." The purpose of this rule is to allow plaintiffs to address a district court's concerns after initial denials of class certification. *See In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 (2d Cir. 2007). "District courts have ample discretion to consider (or to decline to consider) a revised class certification motion after an initial denial." *Id.* However, "the [c]ourt may not disturb its prior certification findings absent some significant intervening event, or a

showing of compelling reasons to reexamine the question." *Gortat v. Capala Bros., Inc.*, 2012 WL 1116495, at *2 (E.D.N.Y. Apr. 3, 2012) (alteration adopted) (quoting *Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167, 169 (S.D.N.Y. 2011)).

Plaintiffs move to renew on two bases: (1) the proposed intervention of Mr. Nance and Mr. Williams as plaintiffs and (2) new statistical evidence of the BPD's ongoing program of racially discriminatory pretextual stops. Because the court denied Plaintiffs' motion to intervene, intervention cannot support the motion to renew.

**B. Whether New Evidence Warrants Renewal of the Class Certification Motion.**

Where an earlier motion for class certification has been denied, courts in the Second Circuit generally hold that "any renewed motion for class certification by Plaintiffs must be based on a more robust submission that points to admissible evidence where necessary to establish the Rule 23 requirements for class certification." *Vega v. Semple*, 2023 WL 5395479, at *3 (D. Conn. Aug. 22, 2023); *see also Dash v. Seagate Tech. (US) Holdings, Inc.*, 2016 WL 4491822, at *1 (E.D.N.Y. July 12, 2016) ("Plaintiff's counsel is hereby advised that the [renewed] motion shall not contain arguments or evidence previously submitted to the [c]ourt on the prior motion . . . [and] if the [c]ourt finds the renewed motion for class certification to be a frivolous attempt at reargument of the prior motion, costs may be imposed."). "Alternatively, plaintiffs could opt to propose a different and more supportable class definition on a renewed motion, without showing a change in the law or new evidence." *Savinova v. Nova Home Care, LLC*, 2024 WL 3552425, at *7 (D. Conn. July 26, 2024) (citing *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 476-77 (3d Cir. 2020)). This mirrors the standard required for reconsideration.

Plaintiffs neither propose a new definition of the Traffic Enforcement Class nor do they seek more narrowly tailored injunctive relief. Instead, they claim they have developed better and more recent statistical and video evidence of discriminatory traffic enforcement.

In reconsideration cases, evidence within a party's possession prior to the court's ruling is rarely deemed "newly available evidence." *See, e.g., First State Ins. Co. v.*

*Ferguson Enters., Inc.*, 2019 WL 2521838, at *5 (D. Conn. June 18, 2019) ("[E]vidence in a party's possession before a court's ruling is not considered 'newly available' evidence."); *Ahmad v. Int'l Bus. Machs. Corp.*, 2013 WL 12221829, at *6 (D. Vt. Mar. 28, 2013) (ruling that evidence party had for two years prior to court's decision was not new); *Winkler v. Grant*, 2008 WL 3539898, at *1 (W.D.N.Y. Aug. 12, 2008) ("Evidence that a party had prior to judgment being entered is not considered new evidence, and does not entitle the party to reconsideration.") (citing *Stewart Park & Rsrv. Coal. Inc. v. Slater*, 374 F. Supp. 2d 243, 253 (N.D.N.Y. 2005)).

Here, the new evidence cited by Plaintiffs includes "emerging statistical evidence" available after depositions taken in the summer and fall of 2024 that allegedly shows "BPD routinely conducts racially disproportionate traffic stops without constitutionally sufficient bases to do so[,]" (Doc. 344 at 57) (capitalization omitted), based on video evidence of allegedly pretextual stops from the last six months of 2024 first provided by Defendants in December 2024. This evidence was not available prior to the October 23, 2024 hearing to certify the Traffic Enforcement Class. However, all of the evidence was available prior to the court's April 22, 2025 ruling on class certification. Plaintiffs did not request to supplement the record with it, nor do they establish it materially transforms the record before the court such that a different outcome is warranted. Accordingly, it does not justify renewal of class certification.

For the same reasons that reconsideration was denied, Plaintiffs' motion to renew is therefore DENIED.

## CONCLUSION

For the foregoing reasons, the court DENIES Plaintiffs' motion to reconsider or renew, (Doc. 327), and DENIES Plaintiffs' motion to intervene Market Nance and Thomas Christopher Williams, Jr. as plaintiffs and representatives of the Traffic Enforcement Class. (Doc. 326.)

SO ORDERED.

Dated this 27th day of March, 2026.

Christina Reiss, District Judge
United States District Court

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

BLACK LOVE RESISTS IN THE RUST, DORETHEA FRANKLIN, TANIQUA SIMMONS, DE'JON HALL, JANE DOE, Individually and on behalf of a class of Others similarly situated, SHIRLEY SARMIENTO, EBONY YELDON, CHARLES PALMER, SHAKETA REDDEN, and JOSEPH BONDS,

Plaintiffs,

v.

CITY OF BUFFALO, N.Y., BYRON B. BROWN, Mayor of the City of Buffalo, in his individual and official capacities, BYRON C. LOCKWOOD, Commissioner of the Buffalo Police Department, in his individual capacity, DANIEL DERENDA, former Commissioner of the Buffalo Police Department, in his individual capacity, AARON YOUNG, officer of the Buffalo Police Department, in his individual capacity, KEVIN BRINKWORTH, PHILIP SERAFINI, officer of the Buffalo Police Department, in his individual capacity, ROBBIN THOMAS, officer of the Buffalo Police Department, in his individual capacity, UNKNOWN SUPERVISORY PERSONNEL 1-10, officers of the Buffalo Police Department, in their individual capacities, UNKNOWN OFFICERS 1-20, officers of the Buffalo Police Department, in their individual capacities, and ERIE COUNTY DISTRICT ATTORNEY'S OFFICE,

Defendants.

Case No. 1:18-cv-00719

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO CERTIFY CLASS**
(Doc. 202)

Plaintiffs Shaketa Redden, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Joseph Bonds, Charles Palmer, Shirley Sarmiento, Ebony Yeldon, and Jasmine Evans bring this action against the City of Buffalo, New York (the "City"); City of Buffalo Mayor Byron B. Brown; Buffalo Police Department ("BPD") Commissioner Byron C. Lockwood; former BPD Commissioner Daniel Derenda; Aaron Young; Kevin Brinkworth; Philip Serafini; Robbin Thomas; and 1-10 unknown supervisory officers and 1-20 unknown officers (collectively, "Defendants") on behalf of themselves and other Black and Latino motorists in the City.

Plaintiffs claim that the City has unlawfully targeted Black and Latino motorists through the use of administrative traffic checkpoints (the "Checkpoints"). Even after the Checkpoints were discontinued, they assert City police officers, in accordance with an implicit quota system, continue to systematically target Black and Latino motorists for traffic enforcement, fines, and penalties. Plaintiffs seek to certify three distinct classes: (1) a "Checkpoint Class";[1] (2) a "Tinted Windows Class";[2] and (3) a "Traffic Enforcement Class."[3] (Doc. 211 at 3.)

The Checkpoint Class, represented by Plaintiffs Bonds, Evans, and Redden, asserts claims for: (1) a violation of the Fourth Amendment; (2) a violation of the Fourteenth Amendment Due Process Clause; (3) a violation of the Fourteenth

---

[1] Plaintiffs define the Checkpoint Class as: "All individuals who received a ticket or were arrested at a BPD 'traffic safety' vehicle checkpoint on or after June 28, 2015." (Doc. 211 at 12.)

[2] Plaintiffs define the Tinted Windows Class as: "All Black and/or Latino individuals who received multiple tinted windows tickets from the BPD in a single traffic stop on or after June 28, 2015." *Id.*

[3] Plaintiffs define the Traffic Enforcement Class as: "All Black and/or Latino individuals who have been or will be subjected to traffic stops, traffic tickets, and 'traffic safety' vehicle checkpoints by the BPD." *Id.*

Case: 26-968, 04/14/2026, DktEntry: 1.1, Page 65 of 90

Amendment Equal Protection Clause; and (4) a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d).

The Tinted Windows and Traffic Enforcement Classes assert claims for: (1) a violation of the Fourteenth Amendment Equal Protection Clause; (2) a violation of the Fourteenth Amendment Due Process Clause; and (3) a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d). Plaintiffs Franklin, Palmer, and Yeldon are the proposed class representatives for the Tinted Windows Class. All individual Plaintiffs in the suit will serve as class representatives for the Traffic Enforcement Class.

Plaintiffs seek a declaration that Defendants have violated Plaintiffs' constitutional rights and a class-wide injunction mandating significant changes in Defendants' policies, practices, and customs, as well as an award of compensatory and punitive damages, attorney's fees, and costs.

Plaintiffs seek class certification under Fed. R. Civ. P. 23(a) and 23(b)(3) for the Checkpoint and Tinted Windows Classes, and class certification under Fed. R. Civ. P. 23(a) and 23(b)(2) for the Traffic Enforcement Class. In their supplemental submission in support of class certification, they advised that "the Checkpoint and Tinted Windows Classes will not seek to recover damages for consequential harms, such as emotional distress and lost wages[.]" (Doc. 241 at 1) (emphasis in original). For these classes, Plaintiffs intend to pursue "(1) general damages in an amount determined by the jury;[] (2) punitive damages in an amount determined by the jury; (3) direct economic damages, consisting of the fines and fees that class members paid in connection with tickets and impounds; and (4) equitable disgorgement of the same." *Id.* at 2.

Plaintiffs are represented by Claudia Wilner, Esq., Andrea Chinyere Ezie, Esq., Andrew J. Timmick, Esq., Anjana Malhotra, Esq., Baher Azmy, Esq., Christine Adrienne Nelson, Esq., Edward Krugman, Esq., Joseph A. Kelemen, Esq., Matthew Alan Parham, Esq., Philip A. Irwin, Esq., Jordan Scott Joachim, Esq. Defendants are represented by Peter A. Sahasrabudhe, Esq., Robert Emmet Quinn, Esq., Cheyenne Nicole Freely, Esq., and Hugh M. Russ, III, Esq.

Case: 26-968, 04/14/2026, DktEntry: 1.1, Page 66 of 90

I. **Plaintiffs' Factual Allegations.**

The following facts are derived from Plaintiffs' Amended Complaint and the parties' briefing.

A. **The Strike Force Checkpoints.**

In 2012, Mayor Brown and former Police Commissioner Derenda created "a mobile unit that targeted supposed crime hotspots to reduce guns, drugs, and gang activity[]" (the "Strike Force"). (Doc. 63 at 10, ¶ 35.) The Strike Force operated through the Checkpoints and required any vehicle approaching to be stopped, regardless of whether BPD Officers had "probable cause or reasonable, articulable suspicion that the driver ha[d] violated any criminal or traffic laws." *Id.* at 11, 15, ¶¶ 36, 61. Plaintiffs assert that the Checkpoints were often established on one-way streets and were not marked in any way to alert approaching motorists. BPD officers or their supervisors determined the Checkpoint locations.

Based upon statistical analyses, Plaintiffs allege that a neighborhood's racial composition was a significant factor in determining Checkpoint locations because a majority of the Checkpoints were established in overwhelmingly Black or Latino neighborhoods. BPD Checkpoint data, through June 30, 2017, allegedly reveals that "BPD conducted nearly 40% of all Checkpoints . . . in just three of Buffalo's 77 Census tracts. In each of those three tracts, the Black or Latino population exceeded 86%." *Id.* at 18, ¶ 83. BPD also considered the number of reported crimes in a particular area in determining Checkpoint locations. Plaintiffs contend, however, that crime statistics played only a minor role in designating a Checkpoint, and that the Checkpoint locations were unrelated to traffic safety concerns.

BPD Officers conducted Checkpoints in stages. During the first stage, vehicles passing through the Checkpoint were subject to automatic license plate readings, with BPD Officers checking for "valid licenses, registration, inspection stickers, seatbelts, and anything suspicious in plain view." *Id.* at 11, ¶ 41. At this stage, BPD Officers asked motorists questions such as "Where are you going?" and "Where are you coming from?" *Id.* at ¶ 42 (internal quotation marks omitted). Depending on the outcome of the first

stage, BPD Officers directed some motorists to pull over for a second stage, during which motorists were subjected to longer detentions and questioning.

Plaintiffs contend that Strike Force and Housing Unit Officers "conducted the Checkpoints in a uniform manner in accordance with" BPD's policy, (Doc. 211 at 14), which failed to constrain officer discretion, because it was allegedly devoid of "written rules, standards, or guidelines" regarding when officers should direct motorists to secondary stops. (Doc. 63 at 12, ¶ 45.) Plaintiffs assert BPD leadership "do[es] not gather and review statistical information" regarding Checkpoints that would reveal whether they are conducted pursuant to racially discriminatory practices. *Id.* at 38, ¶ 201.

BPD Officers conducting Checkpoints were instructed to complete a Checkpoint Directive, although they did not always comply with this requirement, and some Checkpoints were undocumented as evidenced by ticketing data that reveals citations on dates with no Checkpoint Directives. Plaintiffs contend that these undocumented Checkpoints were operated "as a common practice over a period of years . . . and with the knowledge and approval of senior officers." *Id.* at 14, ¶ 59.

The Strike Force partnered with the BPD Housing Unit to implement Checkpoints near housing complexes operated by the Buffalo Municipal Housing Authority ("BMHA"). These joint Checkpoints were allegedly conducted "to suppress blatant drug/weapons activity and to show a high level of enforcement and visibility." *Id.* at 17, ¶ 74 (internal quotation marks omitted). Plaintiffs allege the Housing Unit focused on patrolling three BMHA properties, all of which have a significant majority of either Black or Latino residents. When concerns arose that Checkpoints were being conducted in a racially discriminatory manner in 2015, BPD "began to conduct Checkpoints in white neighborhoods that had never previously experienced Checkpoints . . . in an effort to demonstrate to the public that it did not conduct Checkpoints in a discriminatory manner." *Id.* at 36, ¶ 184.

The Strike Force and BPD Housing Unit conducted Checkpoints through January 2018. The Strike Force was dissolved in February 2018, and Strike Force officers were transferred to the Division of Traffic Enforcement. Plaintiffs allege that, although

Checkpoints are no longer conducted, there is "no formal policy ending the Checkpoint program" and BPD leadership "could direct BPD Officers to resume operating Checkpoints at any time." *Id.* at 38, ¶ 199.

**B. The BPD's Ticketing Practices.**

In certain circumstances, BPD Officers have the discretion to issue multiple traffic citations for a tinted windows violation on a single vehicle. Plaintiffs contend that "non-White motorists are much more likely to be ticketed by the BPD than are White motorists[,]" (Doc. 63 at 24, ¶ 110), and that a motorist's race is a strong predictor of whether BPD Officers exercise their discretion to issue a single tinted-window citation, or multiple tinted-window citations during a stop. Plaintiffs argue BPD leadership "do[es] not gather and review statistical information about traffic stops outside Checkpoints[]" to determine racially discriminatory traffic law enforcement. *Id.* at 38, ¶ 202.

Plaintiffs allege that BPD's aggressive enforcement of traffic laws is a product of the City's "custom, policy, or practice of generating revenue through traffic enforcement[.]" *Id.* at 25, ¶ 120. Although historically New York State received traffic enforcement proceeds, in 2014, the Buffalo Common Council and New York State legislature established the Buffalo Traffic Violations Agency ("BTVA"), an agency responsible for adjudicating non-misdemeanor traffic violations. Creation of the BTVA allowed the City to retain the revenues generated from traffic law enforcement.

Plaintiffs allege there was a marked increase in the number of citations issued after the BTVA was created. As a result of increased revenues, the City appropriated more money for the BPD, and in turn, the BPD increased spending on overtime for Strike Force officers which substantially increased their pay. The City allegedly has continued this practice, notwithstanding the cessation of Checkpoints and the dissolution of the Strike Force.

## II. Legal Conclusions and Analysis.

### A. Whether Plaintiffs' Requested Injunctive Relief Would Merely Require Defendants to Obey the Law.

In their Amended Complaint, on behalf of the Traffic Enforcement Class, Plaintiffs seek to preliminarily and permanently enjoin Defendants:

> (a) From continuing the policy, practice, and custom of conducting vehicle Checkpoints for the purpose of general crime control;
>
> (b) From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints in a manner that targets Buffalo residents on the basis of their race and ethnicity;
>
> (c) From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints for improper pecuniary purposes;
>
> (d) From continuing to enforce and assess any of the 13 BTVA fees enumerated in § 175-1 of Buffalo Municipal Code Chapter 175[;]
>
> (e) To institute and implement policies and programs with respect to training, supervision, and discipline that will eliminate the policy, pattern, practice, and custom of:
>
> i. conducting vehicle Checkpoints for the purpose of general crime control;
>
> ii. enforcing traffic laws in a manner that targets Buffalo residents on the basis of their race and ethnicity or that reflects an improper pecuniary motive[;]
>
> (f) To institute and implement appropriate and adequate supervision and discipline of BPD officers and personnel who conduct vehicle Checkpoints;
>
> (g) To implement appropriate measures to ensure that BPD officers and personnel document all traffic stops and vehicle Checkpoints in sufficient detail as to permit supervisory review for compliance with the Fourth and Fourteenth Amendments and Title VI of the Civil Rights Act; [and]

(h) To implement appropriate measures to ensure that documentation of all traffic stops and vehicle Checkpoints is retained in a single, up-to-date computerized database[.]

*Id.* at 73-74.

Defendants challenge Plaintiffs' proposed injunctive relief as requesting an "obey the law" injunction. Plaintiffs counter that they seek injunctive relief in the form of "a single, class-wide order directing the City to modify its policies and procedures to prevent the BPD from engaging in racially motivated traffic stops and ticketing and retaining jurisdiction until such time as the City can establish compliance[.]" (Doc. 241 at 4.)

"Under Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law." *Am. Soc'y for the Prevention of Cruelty to Animals v. Animal & Plant Health Inspection Serv.*, 60 F.4th 16, 22 (2d Cir. 2023) (alteration and internal quotation marks omitted) (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001)). It must instead "'state its terms specifically' and 'describe in reasonable detail . . . the act or acts restrained or required[.]'" *Poor v. Amazon.com Servs. LLC*, 104 F.4th 433, 441 n.8 (2d Cir. 2024) (quoting Fed. R. Civ. P. 65(d)).

Although Plaintiffs provide examples of remedies that they may request,[4] and which may narrow and further define the scope of the requested injunctive relief, their Amended Complaint cannot be amended by their briefing. *See Palm Beach Mar. Museum, Inc. v. Hapoalim Sec. USA, Inc.*, 810 F. App'x 17, 20 (2d Cir. 2020) ("[A] complaint may not be amended by . . . an opposition brief wholly unsupported by factual allegations in the complaint.") (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)); *In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 541 (S.D.N.Y. 2021) ("[A] plaintiff may not raise new facts in opposing dismissal and ask the [c]ourt to rely

---

[4] Plaintiffs' examples of appropriate relief include: "[c]essation of BPD policies and practices contributing to racially biased traffic enforcement[]"; "[r]eforms to supervision and officer performance evaluation criteria"; "[r]eforms to the Internal Affairs Department"; and "[a] mechanism overseen by a court-appointed monitor[.]" (Doc. 241 at 11.)

on those facts in determining whether he or she has stated a claim.") (quoting *Wright*, 152 F.3d at 178).

To the extent Plaintiffs' injunctive relief requests "obey the law" relief, it is not available under Rule 65(d). *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (alteration adopted) (finding that injunctions that "impose[d] on defendants an obligation to act 'in full conformity with applicable laws pertaining to firearms,' and to 'adopt appropriate prophylactic measures to prevent violation' of those laws[]" failed under Rule 65(d)); *Wakefield v. Scott*, 2021 WL 10342467, at *4 (D. Vt. June 24, 2021) (noting plaintiff's claims for injunctive relief failed "because her request for a command to 'direct defendants from violating the law' did not comply with Federal Rule of Civil Procedure 65(d) and Second Circuit precedent requiring that an injunction be more specific than a simple command that the defendant obey the law[]") (citation omitted)).

**B. Whether the Traffic Enforcement Class has Standing.**

Plaintiffs seek injunctive relief for the Traffic Enforcement Class consisting of "[a]ll Black and/or Latino individuals who have been or will be subjected to traffic stops, traffic tickets, and 'traffic safety' vehicle checkpoints by the BPD." (Doc. 211 at 12.) The Traffic Enforcement Class is virtually limitless because it does not specify a time period for class membership or specify a future duration for the proposed injunction. Plaintiffs concede that BPD leadership "do[es] not gather and review statistical information" regarding traffic stops outside Checkpoints. (Doc. 63 at 38, ¶ 201.)

Although Plaintiffs are correct that the inclusion of future members does not defeat class certification,[5] for purposes of standing, Plaintiffs' proposed relief requires the court to forecast the likelihood of future constitutional violations.

---

[5] *See, e.g.*, *Barrows v. Becerra*, 24 F.4th 116, 130 n.54 (2d Cir. 2022) ("The final class certified by the district court includes[ a]ll Medicare beneficiaries who, on or after January 1, 2009 . . . ."); *Sykes v. Mel S. Harris & Assocs.*, 780 F.3d 70, 79 (2d Cir. 2015) (affirming district court's certification of a class that comprised "all persons who have been or will be sued by the Mel Harris defendants as counsel for the Leucadia defendants"); *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) (involving certified class comprised of "children who are or will be in

Defendants argue that, because the City ceased using Checkpoints as of January 2018 and disbanded the Strike Force, the Traffic Enforcement Class lacks standing to pursue injunctive relief as any future injury is purely speculative. Plaintiffs respond that Defendants have not disavowed the Checkpoints, which could resume at any time, and that the potential for their revival poses a non-speculative threat of constitutional violations.

In a class action, "[s]tanding is satisfied so long as at least one named plaintiff can demonstrate the requisite injury." *Hyland v. Navient Corp.*, 48 F.4th 110, 117-18 (2d Cir. 2022) (citing *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019)); *see also Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("[W]hen there are multiple plaintiffs[,] [a]t least one plaintiff must have standing[.]"). "[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560-61).

When seeking injunctive relief, "[a plaintiff] must carry the burden of establishing that 'he [or she] has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)). In meeting his or her burden, a plaintiff "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he [or she] . . . will be injured in the future." *Id.* (internal quotation marks omitted) (quoting *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)). A showing of an "abstract injury is not enough; rather, '[t]he injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical."'" *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

---

the custody of the New York City Administration for Children's Services") (internal quotation marks omitted).

Case: 26-968, 04/14/2026, DktEntry: 1.1, Page 73 of 90

At the pleading stage, the burden to establish standing is minimal. As a case progresses, and certainly at class certification, the evidence necessary to satisfy standing increases. *See Carter v. HealthPort Techs. LLC*, 822 F.3d 47, 56 (2d Cir. 2016) ("[T]he showing that must be made in order to withstand a dismissal for lack of standing increases as the suit proceeds."). The Supreme Court has explained:

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Lujan*, 504 U.S. at 561 (alteration adopted) (internal citations and quotation marks omitted).

Although Plaintiffs assert there is "no formal policy ending the Checkpoint program[,]" (Doc. 63 at 38, ¶ 199), they cite no evidence that BPD has taken steps to resume them. Several individual Plaintiffs in the Traffic Enforcement Class attest to having received multiple traffic citations unrelated to Checkpoints. Plaintiff Bonds declared "[i]n 2019, I received so many tickets while my car was not in use and parked at my BMHA residence that I eventually had to sell my car because I could not afford to pay for the tickets or to keep my car in a private garage to avoid getting more tickets." (Doc. 202-1 at 2-3, ¶ 12.) Plaintiff Yeldon declared that:

> In December 2017[,] I was driving my taxi in a predominantly white neighborhood on the South Side of Buffalo, when BPD Officer Michael Healy pulled me over and issued me two tickets for tinted windows and one ticket for driving without insurance (even though the car belonged to my employer, and I had insurance at the time). In the summer of 2022 BPD ticketed my car while it was parked in the BMHA-owned parking lot of the Ferry Grider Apartments . . . . When I went to court, the ticket was dismissed.

(Doc. 202-9 at 1-2, ¶¶ 6-7.) All of these incidents refer to past harm.

In *Floyd v. City of New York*, 283 F.R.D. 153, 169-70 (S.D.N.Y. 2012), the court found a plaintiff seeking an injunction mandating changes to New York City's stop and frisk program had standing because (1) the plaintiff had been stopped and frisked four separate times; (2) the plaintiff's "future injury does not depend on his being arrested for unlawful conduct and so he cannot avoid that injury by following the law"; and (3) "the frequency of alleged injuries inflicted by the practices at issue here creates a likelihood of future injury[.]"[6] The challenged governmental policy at issue in *Floyd* was ongoing at the time of the lawsuit.

Unlike in *Floyd,* the Checkpoints at issue in this case ceased in 2018, the Strike Force disbanded, and none of the Plaintiffs' attestations pertain to Checkpoints that took place in the past two years. Instead, Plaintiffs rely on the speculative possibility that, at some uncertain date in the future, the Checkpoints may resume. This will not suffice for standing for injunctive relief.

To the extent Plaintiffs rely on evidence that non-white motorists are statistically more likely to receive a traffic infraction ticket than white motorists, and to receive multiple tickets if cited, *see* Doc. 63 at 24, ¶ 110, this evidence also reflects past alleged harms. Although Plaintiffs contend the "frequency of alleged injuries . . . creates a likelihood of future injury[,]" *Floyd*, 283 F.R.D. at 170, it does not rise to a "real and immediate threat of future injury[.]" *Shain*, 356 F.3d at 215; *see also Lyons*, 461 U.S. at 111 ("Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a

[6] The district court had previously "declar[ed] the Street Crime Unit's ('SCU') practice and/or custom of suspicionless stops and frisks to be unconstitutional." *Nat'l Cong. for Puerto Rican Rts. v. City of New York*, 75 F. Supp. 2d 154, 158 (S.D.N.Y. 1999). The court found the individual plaintiffs had established standing because: (1) "there is [a] difference in the number of alleged constitutional violations resulting from the challenged policies"; (2) the victims "claim they have been victimized by [the] unconstitutional practices repeatedly"; and (3) "there is no chain of contingencies making the threat of future harm speculative. . . . [P]laintiffs do not have to break the law to be exposed to the alleged constitutional violations." *Id.* at 161.

Case: 26-968, 04/14/2026, DktEntry: 1.1, Page 75 of 90

federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional.").[7]

Because no Plaintiff has established that he or she is "immediately in danger of sustaining some direct injury as the result of the challenged official conduct[,]" *Shain*, 356 F.3d at 215 (internal quotation marks omitted) (quoting *Lyons*, 461 U.S. at 101-02), Plaintiffs have failed to establish that the members of the Traffic Enforcement Class have standing. For this reason, the Traffic Enforcement Class's request for class certification DENIED. *See MacNamara v. City of New York*, 275 F.R.D. 125, 132, 140 (S.D.N.Y. 2011) (finding individuals arrested by the NYPD for their protests during the 2004 Republican National Convention did not have standing because they failed to establish the likelihood of a future encounter with the police that would result in unconstitutional arrests and detentions).

**C. Whether the Remaining Proposed Classes Satisfy Fed. R. Civ. P. 23.**

Plaintiffs seek damages on behalf of the Checkpoint Class and the Tinted Windows Class and request class certification to establish the alleged constitutional violations that give rise to their damages claims. "Class certification is governed by Federal Rule of Civil Procedure 23." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011) ("*Wal-Mart*"). "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010).

Under Rule 23(a), the party seeking certification must establish:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

---

[7] Part of the standing inquiry is to ensure that the party seeking injunctive relief faces a threatened injury separate and distinct from the public at large. *Israel v. United Nations*, 2025 WL 641566, at *2 (S.D.N.Y. Feb. 26, 2025) ("A litigant raising only a generally available grievance . . . and seeking relief that no more directly and tangibly benefits him than it does the public at large . . . does not state an Article III case or controversy.") (internal quotation marks omitted) (ellipses in original) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013)).

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

*Wal-Mart*, 564 U.S. at 345 (internal quotation marks omitted). These requirements are referred to as "numerosity, commonality, typicality, and adequacy." *Davis v. City of New York*, 296 F.R.D. 158, 163 (S.D.N.Y. 2013).

In determining whether class certification is appropriate, "[i]t is proper for a district court to accept the complaint allegations as true[,]" *Johnson v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 2020 WL 2558160, at *1 (W.D.N.Y. May 19, 2020) (alteration adopted) (internal quotation marks omitted) (quoting *Waggoner v. Barclays PLC*, 875 F.3d 79, 85 n.5 (2d Cir. 2017)), and it may "consider material outside the pleadings . . . , including affidavits." *Id.* (internal quotation marks omitted) (quoting *Cortigiano v. Oceanview Manor Home for Adults*, 227 F.R.D. 194, 203 (E.D.N.Y. 2005)).

While a district court must make factual determinations to ascertain whether the requirements of Fed. R. Civ. P. 23 have been met, "in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement[.]" *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).

**1. Whether the Remaining Proposed Classes Meet the Numerosity Requirement.**

A proposed class must be "so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). "Impracticable does not mean impossible[,]" *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993), it means joinder would be "expensive, time-consuming, and logistically unfeasible." *In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 290 (2d Cir. 1992). In making this determination, "[c]ourts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement." *Robidoux*, 987 F.2d at 935. Instead, district courts consider factors beyond "mere numbers . . . includ[ing] judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial

resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Id.* at 936 (citation omitted).

Plaintiffs allege that the Checkpoint Class contains "at least 3,000 members[,]" and the Tinted Windows Class contains more than 6,000 members. (Doc. 211 at 33.) The total number of individuals in this case is thus estimated to be close to ten thousand. Defendants do not contest numerosity, and the court finds this requirement has been met.[8]

**2. Whether the Remaining Proposed Classes Meet the Commonality Requirement.**

Fed. R. Civ. P. 23(a)(2) requires that there be common questions of law or fact to the class. "[C]laims for relief need not be identical for them to be common." *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022) (internal quotation marks omitted). Instead, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury[.]'" *Wal-Mart*, 564 U.S. at 349-50 (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 157 (1982)). "This does not mean merely that they have all suffered a violation of the same provision of law." *Id.* at 350. "What matters to class certification . . . is . . . the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (emphasis in original) (internal quotation marks omitted).

"Plaintiffs seeking class certification based on challenges to a defendant's policies must show that the policies caused every class member's injury." *Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1263 (9th Cir. 2024) (citing *Wal-Mart*, 564 U.S. at 353, 355); *see V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554, 573, 575 (N.D.N.Y. 2017) (finding commonality was met where plaintiffs alleged the defendants

---

[8] *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) ("A group [of hundreds of defendants] would make the joinder of individual members as named defendants impracticable. Because numerosity is presumed at a level of 40 members, whether viewed as 700 tax-collecting jurisdictions or 300 assessing jurisdictions, the number of defendants vastly exceeds this threshold.") (citation omitted); *In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 290 (2d Cir. 1992) (finding numerosity satisfied for a class of "nearly 850 claimants").

"ha[d] applied a common course of unlawful conduct to the members of the class"). To determine whether a proposed class meets the commonality requirement, "sometimes it may be necessary for the court to probe behind the pleadings[,]" *Falcon*, 457 U.S. at 160, which entails "some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351.

Defendants argue that none of the proposed classes satisfy the commonality requirement because the determination of general and individualized damages, even with Plaintiffs' narrowing of the relief sought, is ill-suited for class action litigation. Commonality, however, may be satisfied by common questions of law and fact and need not encompass every issue in the case. *See id.* at 359.

Here, commonality for the Checkpoint Class arises out of allegedly uniform and unconstitutional BPD practices conducted at discrete and identifiable Checkpoints raising a legal challenge common to all class members and all Defendants.[9] *See Floyd*, 283 F.R.D. at 173-74 (finding claims based on NYPD's stop-and-frisk policy met the commonality requirement because they "generate[d] from a centralized source and NYPD employs a hierarchical supervisory structure to effect and reinforce its department-wide policies[]"); *Stinson v. City of New York*, 282 F.R.D. 360, 370 (S.D.N.Y. 2012) (finding commonality where plaintiffs allege "a specific policy promulgated by [d]efendants, namely, that [d]efendants have established a practice by which NYPD officers issue summonses without probable cause in order to meet a summons quota[]"). Common questions of law include whether the initial stop was lawful and, if so, whether the secondary stop was lawful as well. *See Plaintiffs #1-21 v. Cnty. of Suffolk*, 2021 WL 1255011, at *14 (E.D.N.Y. Mar. 12, 2021) ("*Cnty. of Suffolk*")

---

[9] This type of commonality is particularly well-suited to class certification. *See, e.g.*, *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 989 (D. Ariz. 2011) ("[C]ommonality in cases alleging racial profiling is satisfied when 'the injuries complained of by the named plaintiffs allegedly resulted from the same unconstitutional practice or policy that allegedly injured or will injure the proposed class members.'") (citing *Daniels v. City of New York*, 198 F.R.D. 409, 418 (S.D.N.Y. 2001)).

("The putative class members' and named representatives' claims need not arise out of 'the same course of events' based on identical circumstances leading up to the stop, but rather the unconstitutional stops are due to the institutional practices that plaintiffs allege allowed for discriminatory policing.").

Common questions of fact include where and how the Checkpoints were located, who authorized them, the motive for establishing Checkpoints and whether it was the product of racial profiling, whether the officers' discretion was circumscribed and, if so, whether it was namely tailored to achieve a legitimate law enforcement objective, how the officers chose motorists for secondary inspections, how long detentions lasted at each stop and whether they were unreasonably prolonged, and how officers determined whether a motorist would be ticketed. Because Plaintiffs may seek nominal damages for the alleged constitutional violations, there is commonality for that type of relief as well. *See Luxenberg v. Vt. Dep't of Disabilities, Aging & Indep. Living*, 2024 WL 4894383, at *3 (D. Vt. Nov. 26, 2024) (stating "nominal damages are available when a constitutional violation is established[]") (citing *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021); *Farrar v. Hobby*, 506 U.S. 103, 113 (1992) ("A plaintiff may demand payment for nominal damages no less than he [or she] may demand payment for millions of dollars in compensatory damages.")).

Defendants are correct that individualized claims for economic damages based on the factual basis for each ticket issued require individualized inquiries and Plaintiffs have yet to "offer 'some glue holding the alleged reasons for all those decisions together.'" *Black Lives Matter L.A.*, 113 F.4th at 1263 (citing *Wal-Mart*, 564 U.S. at 352). The possibility of individualized damages, however, does not defeat commonality because the constitutional injury to all class members is the same insofar as it involves an unconstitutional detention. Individual fines and fees are the collateral consequences of that injury. Defendants' challenge regarding individualized damages is thus more properly considered in the context of predominance.

With regard to the Tinted Windows Class, Plaintiffs allege BPD discriminated against Black and Latino motorists and ticketed them to raise revenues which, in turn,

Case: 26-968, 04/14/2026, DktEntry: 1.1, Page 80 of 90

were paid in overtime to BPD Officers. Plaintiffs' statistical evidence allegedly reveals common trends documenting this practice despite a change in BPD leadership.[10] They allege that BPD leadership has been made aware of the issue, and has been unwilling or unable to remedy it. In addition, Plaintiffs allege that discriminatory practices emanated from uniform policies at the highest level of the City and the BPD. *See Cnty. of Suffolk*, 2021 WL 1255011, at *14 (finding commonality where plaintiffs "show[ed] that the types of policies, practices, and decisions at issue were made at high levels of the department[]"). These are common questions of fact which will benefit from class treatment.

Defendants nonetheless raise a legitimate concern regarding individualized damages inquiries. Plaintiffs have yet to propose a common methodology for awarding damages based on tinted windows violations. They, however, do not challenge the initial lawfulness of the tinted-window stops, only the racially motivated ticketing practices that resulted therefrom. In this respect, there remain common issues of law and fact such as whether Black and Latino motorists received a statistically greater number of tinted-window tickets than white motorists, whether a policy circumscribed officer discretion, and whether BPD was aware of racial discrepancies and nonetheless allowed them to persist. The court therefore addresses the issue of individualized damages inquiries in the context of predominance rather than commonality.

Because there are common questions of law and fact for both the Checkpoint Class and the Tinted Windows Class, Plaintiffs have established commonality.

### 3. Whether the Remaining Proposed Classes Meet the Typicality Requirement.

Rule 23 requires that class representatives' claims or defenses must be "typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). "This requirement 'is

---

[10] *See Morrow v. Washington*, 277 F.R.D. 172, 192 (E.D. Tex. 2011) (finding plaintiffs established commonality through statistical evidence that "there was a specific, city-wide policy in Tenaha of targeting racial and ethnic minorities for traffic stops and then illegally detaining and/or arresting them or conducting illegal searches and seizures of their property[]").

satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936-37 (citation omitted).

Plaintiffs claim a violation of the Fourth Amendment under *City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000), which holds that "[w]hen law enforcement authorities pursue primarily general crime control purposes at [vehicle] checkpoints . . . , stops can only be justified by some quantum of individualized suspicion." Plaintiffs Bonds, Evans, and Redden are the putative class representatives for the Checkpoint Class and "are Black individuals who were stopped pursuant to the Checkpoint Policy, and all received tickets at those Checkpoints." (Doc. 211 at 39.)[11] All claims "arise[] from the same course of events[.]" *Brown*, 609 F.3d at 475; *see also Floyd*, 283 F.R.D. at 175 (finding "NYPD's centralized program of stops and frisks" constitutes "the same course of conduct"). Although the dates, times, and locations of the stops may be different, "minor variations in the fact patterns underlying individual claims" do not defeat typicality.[12] *Yeend v.*

---

[11] The lack of Latino Class representatives does not preclude a finding of typicality. *See, e.g.*, *Floyd v. City of New York*, 283 F.R.D. 153, 175 (S.D.N.Y. 2016) (finding typicality despite defendants' argument that "because none of the named representatives are Latino, they cannot represent the alleged Latino class members who make race-based claims[]") (internal quotation marks omitted).

[12] *See, e.g.*, *Ligon v. City of New York*, 288 F.R.D. 72, 82 (S.D.N.Y. 2013) (finding that where "plaintiffs and the putative class members were allegedly subjected to the same unlawful conduct by NYPD officers under the auspices of a single NYPD program: unjustified *Terry* stops, not supported by reasonable suspicion . . . the experiences of the named plaintiffs are identical to those of the proposed class, [and] the typicality requirement is . . . met"); *Daniels*, 198 F.R.D. at 418 (finding claims arising from suspicionless stop and frisks satisfied the typicality requirement because they challenged "the same unlawful conduct" and because "the named plaintiffs and the class members will allege that these stops were made in violation of the Fourth Amendment because the officers lacked reasonable suspicion to make a stop").

*Akima Glob. Servs., LLC*, 2025 WL 959968, at *12 (N.D.N.Y. Mar. 31, 2025) (quoting *Robidoux*, 987 F.2d at 936-37). Plaintiffs have therefore established typicality for the Checkpoint Class.

Plaintiffs Franklin, Palmer, and Yeldon seek to serve as the class representatives for the Tinted Windows Class and are "Black individuals who received multiple tinted-window tickets from BPD officers at a single traffic stop while driving in the City of Buffalo." (Doc. 211 at 39.) Their claims arise from BPD's allegedly unconstitutional practice of issuing multiple citations to Black and Latino motorists for tinted windows as a source of traffic enforcement revenue. This suffices to satisfy typicality because "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant[s'] liability." *Brown*, 609 F.3d at 475. *See also Cnty. of Suffolk*, 2021 WL 1255011, at *14 (finding that different circumstances prompting a traffic stop do not defeat typicality because plaintiffs all claim that "the unconstitutional stops are due to the institutional practices that plaintiffs allege allowed for discriminatory policing[]").

Defendants argue that the Checkpoint Class and Tinted Windows Class lack typicality because some, but not all, Plaintiffs' individualized damages claims are barred by *Townes v. City of New York.* In *Townes,* the Second Circuit refused to adopt a "fruit of the poisonous tree" doctrine in § 1983 cases. 176 F.3d 138, 145 (2d Cir. 1999). This means a plaintiff seeking damages in a § 1983 action cannot argue that, because a detention or seizure was unconstitutional, all traffic enforcement that flowed from it was impermissible and is compensable by damages as the fruit of the unlawful activity. Defendants further contend that "[n]o matter how characterized, Plaintiffs' request for . . . damages . . . require individual determinations." (Doc. 245 at 8.) In so far as individualized damages are concerned, the court agrees. The court, however, treats this issue as a challenge to predominance. It remains true that the class representatives' claims are "typical of claims . . . of the class." Fed. R. Civ. P. 23(a)(3).

**4. Whether the Remaining Proposed Classes Meet the Adequacy Requirement.**

Rule 23(a)'s adequacy requirement instructs that class representatives must fairly and adequately protect the interests of the class. "Two factors generally inform [whether class representatives satisfy the Rule 23(a)(4) requirement]: '(1) absence of conflict and (2) assurance of vigorous prosecution.'" *Irvin v. Harris*, 944 F.3d 63, 71 (2d Cir. 2019) (internal quotation marks and alteration omitted) (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 170 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart*, 564 U.S. 338 (2011)); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) ("Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members."). This inquiry focuses on "uncovering 'conflicts of interest between named parties and the class they seek to represent.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) ("*Flag Telecom*") (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).

Defendants argue that Plaintiffs fail to establish adequacy because "there is a divergence between class representatives who are barred from damages and class representatives and members who may be entitled to damages," purportedly rendering "the class representatives . . . inadequate." (Doc. 220 at 36.) Plaintiffs, however, have amended their requests and no longer seek individualized damages for emotional distress and lost wages. *See* Doc. 241 at 1. For their remaining individual damages claims, adequacy exists because there is no evidence the class representatives' claims conflict with those of other classes or within the class. The fact that one class member may receive greater damages than another is not dispositive provided those awards are not in conflict. *See Allen v. Dairy Farmers of Am., Inc.*, 2012 WL 5844871, at *7 (D. Vt. Nov. 19, 2012) (finding that, although dairy farmers asserted individualized harms as a result of defendants' alleged monopoly, adequacy was established).

A conflict must be "fundamental" to violate Rule 23(a)(4). *See id.*; *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (quoting 7A Charles Alan Wright

& Arthur R. Miller, Federal Practice & Procedure § 1768 (2d ed. 1986) ("It is axiomatic that a putative representative cannot adequately protect the class if his [or her] interests are antagonistic to or in conflict with the objectives of those he [or she] purports to represent.")). In instances where a fundamental conflict does exist, the court may cure the conflict by dividing the class into separate "homogeneous subclasses . . . with separate representation to eliminate conflicting interests of counsel." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999); *see also In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249-50 (2d Cir. 2011) (same); *Allen v. Dairy Farmers of Am., Inc.*, 279 F.R.D. 257, 274 (D. Vt. 2011) (finding a fundamental conflict where "the interests of the class clearly diverge, and the proposed class representatives cannot adequately represent all members of the class[]"). Defendants fail to identify a conflict of this magnitude.

Plaintiffs are represented by three nonprofit civil rights organizations that frequently litigate civil rights cases and a law firm with extensive litigation experience. Defendants do not question the experience and adequacy of Plaintiffs' legal counsel, which are "qualified, experienced[,] and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

The proposed class representatives are similarly situated, if not identical, to the class members they seek to represent, have no antagonistic interests, and thus will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Because the proposed class representatives' and class members' interests align, and because the proposed class representatives do not have "any conflict of interest that would prevent them from serving as a class representative[,]" (Doc. 211 at 41), Plaintiffs have established adequacy.

**5. Whether the Remaining Proposed Classes are Ascertainable.**

Plaintiffs assert that, because their purported class definitions "identify specific groups of people, subjected to specific acts, within a defined time period[,]" *id.* at 42, the proposed class definitions are based on objective criteria and are therefore ascertainable. The Second Circuit has "recognized an implied requirement of ascertainability in Rule 23

of the Federal Rules of Civil Procedure." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (internal quotation marks omitted).

A proposed class "must be 'sufficiently definite' and 'defined by objective criteria' *so that* 'it is administratively feasible for the court to determine whether a particular individual is a member[.]'" *In re Petrobras Sec.*, 862 F.3d 250, 269 n.20 (2d Cir. 2017) (emphasis in original) (quoting *Brecher*, 806 F.3d at 24-25). The Second Circuit has, however, rejected "administrative feasibility as an absolute standard[,]" *id.* 267, and "only preclude[s] certification if a proposed class definition is indeterminate in some fundamental way." *Id.* at 269. "[T]he use of objective criteria cannot alone determine ascertainability when those criteria, taken together, do not establish the definite boundaries of a readily identifiable class." *Id.* at 266 (footnote and internal quotation marks omitted).

Defendants contend the Checkpoint and Tinted Windows Classes are not ascertainable because only members issued invalid tickets are appropriate class members and because Plaintiffs allegedly arbitrarily selected the Classes' determining characteristics. Defendants, however, cannot redefine Plaintiffs' proposed classes.

Plaintiffs define the Checkpoint Class as: "All individuals who received a ticket or were arrested at a BPD 'traffic safety' vehicle checkpoint on or after June 28, 2015." (Doc. 211 at 12.) This class therefore only includes individuals who were ticketed or arrested when passing through a Checkpoint. By narrowing the Checkpoint Class in this manner, Plaintiffs have identified a specific group of drivers determinable by BPD records and other public records who belong to the purported class.

The Tinted Windows Class includes "[a]ll Black and/or Latino individuals who received multiple tinted windows tickets from the BPD in a single traffic stop on or after June 28, 2015." *Id.* Although the proposed definition for the Tinted Windows Class is considerably broader and encompasses a ten-year time period, because the class is limited to Black and Latino drivers who received a ticket for tinted windows, the class remains ascertainable. Plaintiffs have obtained electronic records detailing data of traffic citations and arrests by BPD that "includes the name and driver license number of the person

stopped, the location of the stop or arrest, the specific violation(s) alleged, and the identity of the issuing or arresting officer[.]" *Id.* at 54-55.

The Checkpoint and Tinted Windows Classes may be defined with "objective criteria that are administratively feasible[.]" *Petrobras*, 862 F.3d at 266 (internal quotation marks omitted). Plaintiffs have established ascertainability. *See Godson v. Eltman, Eltman & Cooper, P.C.*, 328 F.R.D. 35, 47 (W.D.N.Y. 2018) (finding that "[s]ince [p]laintiff may easily identify the members of the Settlement Class by reviewing [d]efendants' own records pertaining to the timeframe circumscribed by the class definition, the implied requirement of ascertainability is satisfied[]") (citing *Lizondro-Garcia v. Kefi LLC*, 300 F.R.D. 169, 176 (S.D.N.Y. 2014)).

### D. Whether the Remaining Proposed Classes Meet the Rule 23(b)(3) Requirements.

In addition to Rule 23(a)'s requirements, where damages are sought, Rule 23(b)(3) requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are referred to as "predominance" and "superiority."

#### 1. Whether the Remaining Proposed Classes Meet the Predominance Requirement.

Plaintiffs contend that they will "establish that [a] City policy, custom, or deliberate indifference caused their injuries[,]"and because they challenge BPD policies and practices, "the evidence in support . . . [will allegedly] not vary from class member to class member" for either the Checkpoint Class or the Tinted Windows Class. (Doc. 211 at 44.) Rule 23(b)(3)'s predominance requirement "is satisfied if: (1) resolution of any material 'legal or factual questions . . . can be achieved through generalized proof,' and (2) 'these [common] issues are more substantial than the issues subject only to individualized proof.'" *Petrobras*, 862 F.3d at 270 (alterations in original) (quoting *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016)).

> An individual [legal or factual] question is one where members of a proposed class will need to present evidence that varies from member to

> member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized class-wide proof.

*Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

"Even if Rule 23(a)'s commonality requirement" is met, "the predominance criterion is far more demanding[,]" *Amchem Prods.*, 521 U.S. at 623-24, "and is not satisfied simply by showing that the class claims are framed by the common harm suffered by potential plaintiffs." *Petrobras*, 862 F.3d at 270 (citing *Amchem Prods.*, 521 U.S. at 623-24). "Rule 23(b)(3), however, does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (alterations adopted) (emphasis in original) (citation and internal quotation marks omitted).

Defendants assert that predominance may not be found because each traffic stop requires an individualized determination as to its lawfulness. Plaintiffs counter that no individualized determinations are necessary because all Checkpoint stops were unconstitutional and all Tinted Windows class members' stops were lawful but resulted in racially motivated ticketing. Neither Class thus requires an individualized determination of liability. Defendants respond that questions of individualized damages nonetheless predominate. To the extent Plaintiffs seek general, nominal, and punitive damages, Defendants' concern is unfounded. *See Sykes v. Mel S. Harris & Assocs., LLC*, 780 F.3d 70, 88 (2d Cir. 2015) (finding inquiries related to individualized damages tied to "the return of money extracted from [plaintiffs] as a result of . . . fraudulent judgments" were "not sufficient grounds on which to conclude that the district court's determination that individualized damages issues will not predominate in this case was an abuse of discretion[]"). "[P]laintiffs can—subject to qualified immunity—generally recover damages that are proximately caused by any Fourth Amendment violation." *Cnty. of L.A., Cal. v. Mendez*, 581 U.S. 420, 430-31 (2017). The Second Circuit has recognized that "loss of liberty is a distinct form of damage for which 'general damages' may be recovered." *Betances v. Fischer*, 2022 WL 765963, at *10 (S.D.N.Y. Mar. 14, 2022)

(citing *Kerman v. City of New York*, 374 F.3d 93, 125 (2d Cir. 2004)). Punitive damages may also be awarded on a class-wide basis. *See Brown*, 609 F.3d at 479 (noting the defendants in a putative class action "[we]re subject to claims for damages, including in some cases punitive damages[]").

To the extent Plaintiffs seek individualized economic damages for fines and fees, Defendants' argument gains some traction. Although it may be possible, and Plaintiffs suggest it will be probable, to establish a formula for damages, they have not yet proposed one. It would neither be efficient nor effective to certify a class to address common constitutional claims and then engage in a member-by-member determination of the recoverable damages for fees and fines. *Townes* instructs that the court cannot merely treat those economic injuries as fruit of the poisonous tree and instruct a jury to award damages on that basis.

Because Plaintiffs' requests for individual economic damages for fines and fees will require a determination of whether those economic consequences are justified in each class member's case, common questions of law and fact will not predominate for the damages portion of this case. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (finding district court improperly certified class where "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class[]"). A court may, however, address this issue by decertifying the class to pursue such damages. *See Betances*, 2022 WL 765963, at *16 ("The class can be decertified after [trial] for purposes of pursuing individualized damages issues."). In the alternative, Plaintiffs may amend their request for individualized relief and propose a formula for general damages. In light of these options, denial of class certification on predominance grounds is not warranted at this time.

For the reasons stated above, although a close question, Plaintiffs have established predominance for the Checkpoint Class and the Tinted Windows Class.

### 2. Whether the Remaining Proposed Classes Meet the Superiority Requirement.

Class actions are deemed superior when "they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013) (citing *Amchem Prods.*, 521 U.S. at 617).

> Rule 23(b)(3) identifies four factors for a court to weigh when determining whether a proposed class action satisfies . . . superiority[:] . . . (A) the class members' interests in individually controlling the actions; (B) the extent and nature of any ongoing, related litigation; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Wentworth v. Metrodata Servs., Inc.*, 2020 WL 13527954, at *8 (W.D.N.Y. Nov. 9, 2020) (internal quotation marks omitted) (quoting Fed. R. Civ. P. 23(b)(3)) (citing *Sykes* 780 F.3d at 82).

"Manageability is the most important consideration," *id.* (citing *Sykes*, 780 F.3d at 82), and courts must be mindful of "the inability of the poor or uninformed to enforce their rights and the improbability that large numbers of class members would possess the initiative to litigate individually." *Id.* (internal quotation marks omitted). The need for judicial economy and the financial resources of the potential class members buttress this conclusion. *See Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.").

At this juncture, there is no apparent interest by putative class members to individually litigate their cases, nor would it be economically feasible to do so. There is also apparently no ongoing related litigation. It is both necessary and appropriate to locate the class action in this forum where the constitutional violations allegedly took place so that witnesses and parties may readily attend the trial. According to Plaintiffs, the facts and circumstances foreclose separate lawsuits because many of the proposed

class members "have limited income and lack access to counsel for individual litigation." (Doc. 211 at 54.)

Based on the foregoing, the court finds class certification a superior means of adjudicating this case for the Checkpoint and Tinted Windows Classes.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion to certify class is GRANTED IN PART and DENIED IN PART.

SO ORDERED.

Dated this 22nd day of April, 2025.

Christina Reiss, District Judge
United States District Court